**In re INTEGRATED RESOURCES REAL ESTATE LIMITED PARTNERSHIPS SECURITIES LITIGATION.**

MDL No. 897.
Misc. No. 21–61 (RWS).

United States District Court,
S.D. New York.

Dec. 22, 1993.

As Amended Jan. 4, 1994.

Motions to Reargue Denied April 4, 1994.

Anderson Kill Olick & Oshinsky, P.C., New York City, for defendants as noted herein; Steven M. Pesner, Robert H. Pees, David M. Zensky, of counsel.

Beigel & Sandler, New York City, for plaintiffs as noted herein; Elizabeth Toll, Marilyn Neiman, Alexander T. Moore, of counsel.

Camhy Karlinsky & Stein, New York City, for defendants as noted herein; Kenneth A. Lapatine, Mark H. Budoff, of counsel.

Carter, Ledyard & Milburn, New York City, for defendant Landauer Associates; Beth D. Jacob, Jonathan F. Mack, of counsel.

Martin Mushkin, New York City, for plaintiffs as noted herein.

Townley & Updike, New York City, for defendants as noted herein; Jonathan M. Herman, of counsel.

Waite, Schneider, Bayless & Chesley Co., L.P.A., Cincinnati, OH, for plaintiffs in Ellingson v. Kanzar Assocs.; Stanley M. Chesley, Terrence L. Goodman, of counsel.

Bower & Gardner, New York City, for defendant Appraisal Group Intl.; Barry G. Saretsky, of counsel.

D'Amato & Lynch, New York City, for defendants Dreyer & Traub; Sharon McClosky, of counsel.

Gilbert Segall & Young, New York City, for defendant Anchor National Life Ins.; Jeffrey L. Livingston, Anthony J. Harwood, of counsel.

Dreyer & Traub, New York City, for defendants Rosenberg & Rosenberg; Hannah Flamenbaum, of counsel.

## OPINION

SWEET, District Judge.

The Judicial Panel on Multidistrict Litigation ("MDL") consolidated and transferred to this Court on October 10, 1991, a number of actions arising out of the demise of partnerships affiliated with Integrated Resources, Inc. ("Integrated"), which filed for relief under Chapter 11 of the bankruptcy code, 11 U.S.C. §§ 101, *et seq.*, in 1990. *See In re Integrated Resources, Inc.*, 135 B.R. 746, 748 (Bankr.S.D.N.Y.1992), *aff'd, In re Integrated Resources, Inc.*, 147 B.R. 650 (S.D.N.Y.1992). Pursuant to pretrial orders, the Defendants have moved to dismiss the complaints as set forth below ("Global Motion III"). The motions in the main are granted as described below.

Since the transfer of the original actions, several others have been filed in the Southern District of New York or transferred by the Multidistrict Panel to this Court and consolidated with these proceedings ("Later Filed Actions"). There are presently pending 38 actions.

### The Parties and the Offering

In general, the Plaintiffs in each of these actions bought limited partnership interests in ventures sponsored by Integrated or an entity associated with Integrated. The ventures were investment vehicles which bought, owned, operated, and leased residential and commercial real estate and equipment. The offer and sale of these interests was conducted in compliance with the requirements of Regulation D ("Reg. D"), Rules 501–08, 17 C.F.R. 230.501–.508, of the Securities Act of 1933 ("1933 Act"), 15 U.S.C. §§ 77a, *et seq.*, thereby exempting the transactions from the registration requirements of the 1933 Act.

Since these transactions are not registered with the Securities and Exchange Commission (the "SEC"), the 1933 Act limits purchasers to those who qualify as "accredited investors."

To qualify as a Reg. D accredited investor, a "natural person" must have "[an] individual net worth, or joint net worth with that person's spouse, at the time of his [or her] purchase [in excess of] $1,000,000" or:

> had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year[.]

Rule 501(a)(5) & (6). A trust qualifies for accredited-investor status if it has "total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person ...," Rule 501(a)(7), to wit, one who "has such knowledge and experience in financial and business matters that he [or she] is capable of evaluating the merits and risks of the prospective investment ...," Rule 506(b)(2)(ii).

The purpose of these requirements is to facilitate and expedite specially designed offerings, while at the same time offsetting the danger posed by the lack of SEC scrutiny of the offer and sale by precluding those from participating in the offering who are inexperienced purchasers of securities and unable to afford professional advice regarding the merits and risks of purchasing the offered securities. Each of the investors in the Integrated partnerships was required to represent in writing that he or she qualified for Reg. D accredited-investor status and met the additional financial criteria set forth in the "Who May Invest" section of the confidential private placement memorandum ("PPM") issued for each partnership.[1]

The investors were also warned in the respective partnership PPMs of various financial risks involved with each partnership investment. The following statement from the first paragraph of the Clovine Associates Limited Partnership PPM is typical:

> The tax consequences of an investment in the Partnership, the absence of Cash Flow from such investment for at least the first four years of the operation of the Partnership and the illiquidity of such investment make the purchase of Interests suitable only for investors who have substantial net worth and substantial taxable income, and an Interest should be purchased only as a long-term investment.

Clovine PPM at 1.

Additionally, each PPM contained a section entitled "Risk Factors," in which the various risk factors of the investment were set forth, including, for example, restrictions on transferability and the possible lack of a market for the investment interests; the possible unavailability of tax benefits and changes in the tax law; risks arising from the terms and conditions of purchase money notes, mortgages, and leases; the possible inability to refinance the project; the possible lack of available sources of funds for the operating partnership; risks arising from leveraged financing and the ownership of the specific property; the possible inability to sell the project; and the possible adverse effects of technological developments in competing equipment.

The limited partnerships were highly leveraged, and the Plaintiffs allege they were promised considerable tax savings through debt financing and, after the initial debt was paid off, considerable profits from rental income from the buildings and equipment. The Plaintiffs further allege that the investments had no prospects for success from their inception and served no other economic purpose than to provide the Defendants with millions of dollars of profit in sales proceeds, fees, and other commissions.

In each of the pending actions, different configurations of corporations and corporate officers are named as Defendants. However, the four most significant corporate defendants are briefly described below.

1. *See, e.g., Global III, infra,* fn. 17, discussing additional criteria as set forth in Clovine PPM.

Defendant Integrated Resources, Inc. ("Integrated") organized hundreds of limited partnerships and investment funds.[2]

Defendant Integrated Resources Equity Corporation ("IREC"), a Delaware corporation with its principal place of business in New York, New York, is a wholly-owned subsidiary of Integrated and acted as the participating broker-dealer which sold many of the plaintiffs their limited partnership interests.

Defendant Resources Funding Corporation ("RFC"), a wholly-owned subsidiary of Integrated, was the entity through which many of the limited partnerships acquired their operating interests in the various limited partnerships.

Defendant Integrated Financial Inc., a corporation organized under the laws of the State of Delaware, was a wholly-owned subsidiary of Integrated and sold limited partnership interests to many of the Plaintiffs.

### Prior Proceedings

On February 3, 1992, this Court entered a "Pre–Trial Order No. 1" ("Pre–Trial Order") which, among other things, established an initial motion and discovery schedule for all actions subject to the MDL Order. The Pre–Trial Order created four separate global motion categories relating to the pending cases: (1) statutes of limitations governing the federal securities claims ("Global Motion I"), (2) the legal sufficiency of the federal securities claims ("Global Motion II"), (3) the legal sufficiency of the federal RICO claims ("Global Motion III"), and (4) all Global Motion I, II, III motions applicable to the Later Filed Actions ("Global Motion IV"). The Pre–Trial Order also consolidated the briefing and hearing schedules for Global Motions I and II and Global Motions III and IV.

Additionally, the Pre–Trial Order stayed the production of documents to the Plaintiffs by various parties pending the disposition of the Global Motions.[3] The Pre–Trial Order also stayed the depositions of parties, except as to the Plaintiffs' deposition of Landauer Associates, Inc., in *Clovine/Ellingson*, pending the disposition of the Global Motions and the completion of document discovery.

On January 8, 1993, this Court decided Global Motions I and II. *See In re Integrated Resources Real Estate Ltd. Partnerships Sec. Litig.*, 815 F.Supp. 620 (S.D.N.Y.1993) ("*Global I*" and/or "*Global II*"). On July 20, 1993, the parties filed with this Court a stipulated order dismissing the RICO claims in 13 of the original 14 actions subject to Global Motions I and II.

Thus, at this stage, Global Motion III, which seeks to dismiss the RICO claims, applies only to the following actions:

*Ellingson v. Kanzar Associates*, 91 Civ. 6967 ("*Clovine/Ellingson*") (filed March 14, 1991, in the Southern District of Ohio, Western Division);

*Bloomfield v. Resources Funding Corporation*, 91 Civ. 8530 ("*Two Tier*") (filed December 18, 1991, in the Southern District of New York);

*Neuman v. Integrated Resources Equity Corp.*, 92 Civ. 0023, ("*Net Lease*") (filed January 2, 1992, in the Southern District of New York);

*Pate v. RAM Administration, Inc.*, 91 Civ. 8529 ("*RAM/Pate*") (filed December 18, 1991, in the Southern District of New York);

*Barron v. Miami Executive Towers Associates*, 89 Civ. 8369 ("*Miami Towers*") (filed December 18, 1989, in the Southern District of New York).

Global Motion IV, applying Global Motion I, II and III to the Later Filed Action, only concerns the *Miami Towers* action as § 10(b) claims were not alleged in the *Two Tier*, *Net Lease*, and *RAM/Pate* actions and were dis-

---

**2.** All of the Defendants subject to this motion, and their lawyers, are listed in footnote four, *infra*.

**3.** Those Defendants are the following: Kidder Peabody & Co.; GA Partners Inc.; Marine Midland Bank, N.A.; Hunter Publishing Co.; Deloitte & Touche; Cushman & Wakefield of Pennsylvania; Prudential–Bache Securities, Inc.; Manufacturers Hanover Trust Company; Ameritrust Company National Association; First Interstate Bank of California; Morgan Guaranty Trust Company of New York; Security Pacific National Bank; Signet Bank/Virginia; and Landauer Associates, Inc.

missed with prejudice against *Clovine/Ellingson* in *Global I*, 815 F.Supp. at 648.

Pursuant to the schedule established in the Pre–Trial Order, as amended, the "Anderson Kill" and "Integrated" Defendants (the "Moving Defendants")[4] moved to dismiss Plaintiffs' federal claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, *et seq.*, in the subject actions pursuant to Fed.R.Civ.P. Rules 9(b), 12(b) and 12(c), on April 6, 1992.[5] Most of the Individual Defendants joined in these motions and either adopted the reasoning of the Anderson Kill and Integrated Defendants or submitted their own papers.

As agreed upon by counsel, opposition papers, supplemental briefs and letter briefs were received by the Court through July 30 and oral argument was scheduled for July 21, 1993. Because of jury deliberations in an unrelated case and vacation schedules, no argument was held, and the motions were considered submitted as of that date.

### Global Motion III—Federal RICO Claims

### *Discussion*

On Global Motion III, the many Defendants seek an order dismissing Plaintiffs' RICO claims on numerous grounds, with prejudice, pursuant to Fed.R.Civ.Proc. 12(b), 12(c), and 9(b). For the reasons set forth below, Global Motion III is granted in part and denied in part.

### I. *RICO Is Not Unconstitutionally Vague*

■ The Moving Defendants in four of the five (*Clovine/Ellingson, Two Tier, Net Lease, RAM/Pate* ) remaining Global Motion III actions argue that civil RICO claims have disin-

---

4. The following is a list of the Moving Defendants and their respective attorneys in each case. The Anderson Kill Defendants are represented by Anderson Kill Olick & Oshinsky ("AKOO"), and the Integrated Defendants are represented by Camhy Karlinsky & Stein ("CKS") and Townley & Updike ("TU"):

*Clovine/Ellingson:* Kanzar Assocs. (AKOO), Newzar Assocs. (AKOO), Zar Corp. (AKOO), Somnat Corp. (CKS), Integrated Resources Equity Corp. (CKS), Integrated Financial, Inc. (CKS), Landauer Assocs. (Carter, Ledyard & Milburn).

*Two Tier:* Richard H. Ader (AKOO), Jay David Chazanoff (AKOO), Gary Krat (AKOO), Arthur H. Goldberg (AKOO), Selig A. Zises (AKOO), Jay H. Zises (AKOO), Craig Singer (AKOO), Alan H. Weiner (AKOO), Resources Funding Corp. (CKS), Integrated Resources Equity Corp. (CKS), IR Broadway Holding Co., Inc. (CKS), Erick Realty Corp. (CKS), IR Chicago Plaza, Inc. (CKS), Willowgate Development Co., Inc. (CKS), Winter Lake Realty Corp. (CKS).

*Net Lease:* Richard H. Ader (AKOO), Jay David Chazanoff (AKOO), Arthur H. Goldberg (AKOO), Selig A. Zises (AKOO), Jay H. Zises (AKOO), Seymour Zises (AKOO), Sura Assocs. L.P. (AKOO), Oakber Corp. (AKOO), Occen Corp. (AKOO), Oakmar Leasing Corp. (CKS), Rusec Corp. (CKS), Avazar Assocs. (AKOO), Zisgo Assocs. (AKOO), Vican Assocs. (AKOO), Battin Assocs (AKOO), Integrated Resources Equity Corp. (CKS), Resources Property Development Corp. (CKS) Resources Property Improvement Corp. (CKS), Stemp Leasing Corp. (CKS), Silvad Leasing Corp. (CKS), Barmark Leasing Corp. (CKS), Mervil Leasing Corp. (CKS), Elgun Leasing Corp. (CKS), Powveg Leasing Corp (CKS).

*RAM/Pate:* Z Square G Partners II (AKOO), Richard H. Ader (AKOO), Jay David Chazanoff (AKOO), Gary W. Krat (AKOO), Arthur H. Goldberg (AKOO), Selig A. Zises (AKOO), Jay H. Zises (AKOO), Fivzar Assocs. (AKOO), Kanzar Assocs. (AKOO), Newzar Assocs. (AKOO), Sevzar Assocs. (AKOO), Lane Assocs. (AKOO), Dazad Assocs. (AKOO), EVP Second Corp. (AKOO), Tropria Assocs. (AKOO), Drahcir Realty Assocs. (AKOO), RTA Assocs. (AKOO), EVP Fourth Corp. (AKOO), Fourth Group Partners (AKOO), Resources High Cash, Inc. (CKS), RAM Administration Inc. (CKS), RAM Funding Inc. (CKS), Integrated Resources Equity Corp. (CKS), Integrated Resources Services Inc. (CKS), Integrated Resources Marketing, Inc. (CKS), Rosenberg & Rosenberg (Dreyer & Traub).

*Miami Towers:* The Miami Defendants—Miami Executive Towers Assocs. L.P. (TU), Miami Executive Towers Management Corp. (TU), Integrated Resources Financial Inc. (no counsel), Richard H. Ader (TU), Benjamin D. Fein (TU), Jay David Chazanoff (TU), Gary W. Krat (TU) Daniel N. Davis (TU), Lawrence J. Dowd (TU), Ned H. Cohen (TU), Samuel Dawidowicz (TU), Stephan C. Rosen (TU); Appraisal Group International (Bower & Gardner), Irwin J. Steinberg (Bower & Gardener), Dreyer & Traub (D'Amato & Lynch), Anchor National Life Insurance (Gilbert, Segall and Young).

5. In *Miami Towers*, Global III and IV motions to dismiss Plaintiffs' consolidated Amended and Supplemental Complaint and in Opposition to Plaintiffs' Motion for Leave to Amend their Complaint to add RICO claims first was made orally, by permission of the Honorable John E. Sprizzo, of the Southern District of New York, on July 10, 1991 at a pre-trial conference. The motion was briefed in the fall of 1991 and, before it could be argued the case was transferred to this Court on February 11, 1992, whereupon the parties were instructed to file new briefs, which they did through September 4, 1992.

tegrated into a judicial "Rorschach test,"[6] and, in effect, ask this Court to hold civil RICO claims unconstitutionally vague. The gravamen of Defendants' argument is that RICO is vague because it leads to inconsistent adjudication and it fails to provide adequate notice to civil litigants. Defendants' treatment would have the courts only apply RICO to a "core" area of conduct encompassed by organized crime settings.

The genesis of Defendants' challenge lies in Justice Scalia's dicta in his concurring opinion in *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 256, 109 S.Ct. 2893, 2909, 106 L.Ed.2d 195 (1989) (Scalia, J., concurring) ("That the highest Court in the land has been unable to derive from this statute anything more than today's meager guidance bodes ill for the day when [a constitutional] challenge is presented."). Following up Justice Scalia's sentence in *H.J.*, the Moving Defendants contend that RICO is constitutionally vague as applied in civil litigation, citing the vagueness standard set forth by the Supreme Court in *Connally v. General Constr. Co. See Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926) (holding a statute is unconstitutionally vague if it "forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application").

Of course, it is the *H.J.* majority who rejected such a challenge to the RICO statute. The *H.J.* Court specifically determined that "[c]ongress drafted RICO broadly enough to encompass a wide range of criminal activity, taking many different forms and likely to attract a broad array of perpetrators operating in many different ways" and that "[i]t would be counterproductive and a mismeasure of congressional intent now to adopt a narrow construction of the statute's pattern element that would require proof of an organized crime nexus." *H.J.*, 492 U.S. at 249, 109 S.Ct. at 2905. This language has led subsequent courts to analyze the majority opinion in *H.J.*, written by Justice Brennan,

as a resolution of Defendants' perceived constitutional question. *See, e.g., Kauffmann v. Yoskowitz*, No. 85 Civ. 8414, 1990 WL 300795, at *2, 1990 U.S.Dist. LEXIS 3752, at *2 (S.D.N.Y. Apr. 6, 1990) (declining to find RICO unconstitutional as, in Judge Leisure's words "Justice Blackmun [sic] felt it possible to develop a workable definitional framework for the application of RICO, and set forth to do so. His efforts received the support of the majority of the Court, which apparently also believed that such a framework would result in a workable and prior application of the statute by lower courts.").

Notwithstanding Defendants' projection of Jungian analysis into securities litigation, the courts in this Circuit have quite consciously declined to find RICO constitutionally vague on numerous occasions. *See, e.g., United States v. Coonan*, 938 F.2d 1553, 1561–62 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992); *United States v. Coiro*, 922 F.2d 1008, 1017 (2d Cir.) ("We have previously found that RICO was not unconstitutionally vague in a variety of applications, *see United States v. Ruggiero*, 726 F.2d 913, 923 (2d Cir.), *cert. denied*, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984), *United States v. Huber*, 603 F.2d 387, 393 (2d Cir.1979) *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980); *United States v. Parness*, 503 F.2d 430, 440–42 (2d Cir.1974), *cert. denied*, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975), and we so find here, notwithstanding comments in the concurring opinion in *H.J. Inc. See* 492 U.S. at 255, 109 S.Ct. at 2909 (Scalia, J., concurring)."), *cert. denied*, 501 U.S. 1217, 111 S.Ct. 2826, 115 L.Ed.2d 996 (1991); *Bingham v. Zolt*, 823 F.Supp. 1126, 1132 (S.D.N.Y.1993) (relying on "the clearly established law in this Circuit establishing the constitutionality of the RICO Act."); *Farberware, Inc. v. Groben*, 764 F.Supp. 296, 308 (S.D.N.Y.1991) ("This court has previously rejected invitations by litigants to declare the RICO pattern requirement void for vagueness, and repeats its earlier statement that 'no Court has found

---

6. Defendants cite Carl Jung's discussion of the renowned "Rorschach" or inkblot test as a metaphor for what they perceive to be the inconsistent adjudication of civil RICO claims. Def.'s

Mem. of Law, at 25 citing C.G. Jung, "Approaching the Unconscious," *Man and His Symbols*, (M.L. von Franz ed., 1964).

RICO so unmanageable either for the Court or the litigants that it must fail a constitutional test.'") (citations omitted); *Norstar Bank v. Pepitone*, 742 F.Supp. 1209, 1213 (E.D.N.Y.1990) (disagreeing with Scalia's concurrence in *H.J.* "this Court believes that it would be presumptuous for it to hold the RICO statute unconstitutional at this time."); *United States v. Paccione*, 738 F.Supp. 691, 698 (S.D.N.Y.1990) ("Since the specific allegations in the indictment here and settled precedent remove this case from Justice Scalia's foreboding analysis, this court declines defendants' invitation [to find RICO unconstitutionally vague]."); *In re Adelphi Inst., Inc.*, 112 B.R. 534, 537 (Bankr.S.D.N.Y.1990) ("Although that [*H.J.*] concurrence expresses concern with ambiguity in the "pattern of racketeering" requirement, the Second Circuit has previously considered and rejected similar vagueness challenges to the twenty-year old statute.") (citations omitted).

The Moving Defendants' contention that the "weaknesses of RICO are actually *more* pronounced in civil actions than in Federal criminal prosecutions," Def.'s Mem. of Law at 27, is contrary to the customary heightened constitutional scrutiny for criminal, as opposed to civil, litigants. This point was underscored by the Honorable Eugene H. Nickerson who concluded that the Second Circuit had determined that the RICO statute not unconstitutionally vague for criminal defendants because, as he emphasized, "[i]n a civil case the [constitutional] vagueness standards are even less strict." *United States v. Local 295, Int'l Bhd. of Teamsters*, No. 90–970, 1991 WL 35497, *1, 1991 U.S.Dist. LEXIS 3029, at *5 (E.D.N.Y. Mar. 7, 1991) (citing *Village of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 497, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982)). *But see Beauford v. Helmsley*, 865 F.2d 1386, 1393 (2d Cir.1989) ("And notwithstanding our own views that the RICO provisions cast too wide a net with respect to the civil actions that may be brought, ... it is clear that Congress was aware that persons having no association with organized crime would be ensnared by RICO.... Thus, Congress made the legislative judgment, as it was entitled to do and

which must be given deference, that in order to reach members of organized crime, it was worth reaching other offenders as well.") (citations omitted), *cert. denied*, 493 U.S. 992, 110 S.Ct. 539, 107 L.Ed.2d 537 (1989).

Viewed in light of precedent, RICO is neither unconstitutionally void for vagueness as applied to civil litigants in general, nor as applied in this action.

## II. *Certain Plaintiffs' RICO Claims Are Time Barred*

In Global Motion III, the Moving Defendants seek to dismiss Plaintiffs' RICO claims in *Clovine/Ellingson, Two–Tier, Net Lease* and *RAM/Pate* as barred by application of the four year RICO statute of limitations.[7] For simplicity's sake, the general legal principles governing the statute of limitations issues will be set forth first. These principles will then be applied to the four complaints on a case-by-case basis.

When Congress passed the RICO statute in 1970, it failed to institute a specific limitations period for actions under the statute. In the civil arena, the ensuing confusion regarding the applicable limitations period remained unsettled until the Supreme Court issued its decision in *Agency Holding* which held a uniform four year period as borrowed from federal anti-trust law in the Clayton Act, 15 U.S.C. § 15(b), would be the applicable period for civil RICO claims. *See Agency Holding Corp. v. Malley–Duff Assocs. Inc.*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987) ("*Agency Holding*"). The Supreme Court, however, expressly refused to reach the question of *when* the four year limitations period begins to accrue.

In the wake of the *Agency Holding*, the Circuits have split on the question of when the limitations period begins to run to such an extent that, so far, at least five differing theories of accrual have been generated. *See, e.g.* Paul B. O'Neill, *"Mother of Mercy, Is This the Beginning of RICO?": The Proper Point of Accrual of a Private Civil RICO Action*, 65 N.Y.U.L.Rev. 170 (1990); Mary S. Humes, *RICO and a Uniform Rule of Accru-*

---

7. As Moving Defendants have not at this stage challenged the timeliness of Plaintiffs' RICO claim in *Miami Towers*, the Court will not address this possibility here.

*al*, 99 Yale L.J. 1399 (1990).[8] Commentators have criticized these five disparate rules of accrual and some have even proposed alternative theories. *See, e.g.,* O'Neill, *supra,* at 234–36 (proposing the "pattern formation rule" in which the running of the statutory period is postponed until the plaintiff first discovers or should have discovered the facts relating to two predicate acts necessary to bring a civil RICO action).

The Second Circuit, however, has firmly adopted an "accrual discovery" interpretation for civil RICO's four year limitations period.[9] Under the accrual discovery rule a new cause of action accrues when the defendant commits a violation injuring the plaintiff and is not necessarily determined by the plaintiff's discovery of that violation. In effect, "a plaintiff's action accrues against a defendant for a specific injury on the date that plaintiff discovers or should have discovered that injury … [t]he logical end result is that a plaintiff may sue for any injury he discovers or should have discovered within four years of the commencement of his suit, regardless when the RICO violation causing such injury occurred." *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1103 (2d Cir.1988) (*"Bankers Trust"*) (holding that a new cause of action accrues each time plaintiff discovers new injury in the pattern), *cert. denied,* 490 U.S. 1007, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989). Accordingly, a plaintiff may only bring a claim for damages suffered which he or she reasonably should have discovered in the four years prior to the suit, even though the alleged misrepresentations or omissions causing the damages might have occurred prior to that period.[10]

*Bankers Trust*'s seemingly liberal RICO discovery rule has evolved in the district courts, especially those in the Southern District, to incorporate a stricter due diligence standard. As a result, over the past half decade since *Bankers Trust,* the district courts have established a pragmatic "objective" discovery accrual rule for RICO claims.[11] *Cf. Global I,* 815 F.Supp. at 637–38

---

**8.** Both these articles identify four of the same five theories as follows: first, the "discovery rule," followed by the Fourth, Fifth, Eighth, Ninth and Eleventh Circuits, first articulated in *Compton v. Ide,* 732 F.2d 1429 (9th Cir.1984); second, the "antitrust rule" (or the "separate accrual discovery rule") as articulated by the Second Circuit in *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096 (2d Cir.1988), *cert. denied,* 490 U.S. 1007, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989); third, the "last-act rule" (or "last predicate act rule") adopted by many district courts, most notably the Northern District of Illinois in *County of Cook v. Berger,* 648 F.Supp. 433 (N.D.Ill.1986); fourth, the "last-act discovery rule" (or the "last predicate act discovery rule") as adopted by the Third Circuit in *Keystone Ins. Co. v. Houghton,* 863 F.2d 1125 (3d Cir.1988).

The fifth rule described by O'Neill is the "last-injury discovery rule" adopted by two district courts, *Bankers Trust Co. v. Feldesman,* 648 F.Supp. 17, 35–36 (S.D.N.Y.1986) and *Keystone Ins. Co. v. Houghton,* 692 F.Supp. 466 (E.D.Pa. 1988) both of which were reversed upon appeal. *See* Paul B. O'Neill, *"Mother of Mercy, is This the Beginning of RICO?": The Proper Point of Accrual of a Private Civil RICO Action,* 65 N.Y.U.L.Rev. 170, 225–28 (1990).

The fifth rule described by Humes is the "the Clayton Act Rule" as articulated in *Armbrister v. Roland Int'l Corp.,* 667 F.Supp. 802 (M.D.Fla. 1987) (holding plaintiffs' cause of action accrued at time of contract's signing). Mary S. Humes, *RICO and a Uniform Rule of Accrual,* 99 Yale L.J. 1399, 1416–17 (1990). The article ultimately endorses the "last predicate act discovery rule"

as the theory which serves plaintiffs' need for time to discover their injuries and additionally allows for recovery for acts occurring prior to the four year limitations period.

**9.** *Compare Volk v. D.A. Davidson & Co.,* 816 F.2d 1406, 1415 (9th Cir.1987) (holding accrual occurs when plaintiff discovers his injury, even if damages not ascertainable) *with Bankers Trust Co. v. Rhoades,* 859 F.2d 1096 (2d Cir.1988) (adopting an enhanced discovery rule, in that a second injury triggers a new statute of limitations which may run even though the predicate act which caused the injury falls outside of the limitations period).

**10.** The Second Circuit has recently held that simple omissions are only actionable if the corporation is subject to a duty to disclose the alleged omitted facts:

"a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact. Rather, an omission is actionable under securities laws only when the corporation is subject to a duty to disclose the omitted facts." *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 267 (2d Cir.1993).

**11.** This is especially relevant with respect to securities fraud cases in which the primary alleged acts of fraud—misrepresentations and omissions—all occur at the time of syndication. Indeed, in the post-*Lampf v. Gilbertson,* 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 era, in

**1118**

("objective" test adopted for inquiry notice in securities fraud claims). The RICO limitations test here, then, is an objective one, to wit, when a reasonable person should have discovered the RICO injury, the RICO statute of limitations will start to run. "Just as the plaintiff has the right to a reasonable time in which to bring his claim, so a defendant enjoys the right eventually to be free of stale claims." Humes at 1407 (citing *United States v. Kubrick*, 444 U.S. 111, 117, 100 S.Ct. 352, 356, 62 L.Ed.2d 259 (1979)).

In the securities context, district courts in the Second Circuit have ruled that a plaintiff is placed on inquiry notice by his or her actual or constructive knowledge of facts or circumstances indicating that an investment may have gone awry.

> On a motion to dismiss, when the facts alleged in the complaint indicate that, with reasonable diligence, plaintiffs should have uncovered the alleged fraud prior to the limitations period, the claim will be time-barred.

*Griffin v. McNiff*, 744 F.Supp. 1237, 1255 (S.D.N.Y.1990) (*citing Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir.1983)), *aff'd*, 996 F.2d 303 (2d Cir.1993); *see also McCoy v. Goldberg*, 748 F.Supp. 146 (S.D.N.Y.1990) (holding RICO claim accrued at time plaintiff discovered or should have discovered injury caused by violation); *Construction Technology, Inc. v. Lockformer Co.*, 704 F.Supp. 1212 (S.D.N.Y.1989) (holding RICO claims accrued at time plaintiff discovered or should have discovered the racketeering injury); *Testone v. Niagara Mohawk Power Corp.*, 91–CV–1042, 1992 WL 72145, at *7–8, 1992 U.S.Dist. LEXIS 3743, at *23 (N.D.N.Y. Mar. 26, 1992) ("Facts that should arouse suspicion ... are equated with actual knowledge." *Donahue v. Pendleton Woolen Mills, Inc.*, 633 F.Supp. 1423, 1443).

In *Stevens v. Equidyne Extractive Industries 1980*,[12] this Court found that the plaintiffs' RICO claims accrued on the dates of the offering memorandum and the dates the transaction closed as basis for when the alleged RICO violation occurred. *Stevens v. Equidyne Extractive Indus. 1980*, 694 F.Supp. 1057, 1067 (S.D.N.Y.1988).[13] *But see Cruden v. Bank of New York*, 957 F.2d 961, 978 (2d Cir.1992) (denying defendants' motion to dismiss on RICO statute of limitations because plaintiffs' RICO cause of action accrued at time of default, not at time of alleged fraudulent transfers); *Landy v. Mitchell Petroleum Technology Corp.*, 734 F.Supp. 608, 625 (S.D.N.Y.1990) (finding "the injury, not racketeering activity which triggers the statute of limitation for a RICO action.").

Such an objective discovery RICO limitations rule is consistent with the Second Circuit's determination that the test for the discovery of fraud usually is an objective one.

> "[T]he means of knowledge are the same thing in effect as knowledge itself." *Wood v. Carpenter*, 101 U.S. 135, 143, 25 L.Ed. 807 (1879). "[W]here the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him." *Higgins v. Crouse*, 147 N.Y. 411, 416, 42 N.E. 6 (1895).

*Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir.1983) (applying objective test to securities fraud action).

In a case comparable to Integrated, in which two hundred individual plaintiffs sought to recover their losses as limited partners in shopping centers organized throughout the country, the Honorable Louis J. Freeh noted that:

> *prior* to the Second Circuit's decision in *Bankers Trust* (decided on October 3, 1988).

---

which RICO claims are commonly substituted for stale § 10(b) securities fraud allegations, strict construction of the RICO statute of limitations seeks to enhance the consistency of statute of limitations results.

**12.** This Court's opinion in *Stevens* (decided on July 29, 1988) was handed down four months

**13.** In *Stevens* the complaint did not specify dates for its RICO allegations, the Court therefore adopted the offering memorandum/transaction date as an appropriate moment, which in effect, barred the claim under Civil RICO statute of limitations.

In Bankers Trust, the Second Circuit held that a RICO cause of action accrues each time a plaintiff suffers an injury. 859 F.2d at 1102. However in cases like this one—where plaintiffs acquire an interest in a limited partnership in reliance on allegedly fraudulent offering material—the injury to the plaintiffs is the actual purchase of the partnership interest rather than each subsequent payment of that interest. *Glick v. Berk & Michaels, P.C.,* 1991 WL 152614 (S.D.N.Y.1991) (Haight, J.); *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1105 (plaintiffs' injury accrues when plaintiff became obligated to pay the expense "and not at some later date when it actually made the payment").

*Ackerman v. National Property Analysts, Inc.,* No. 92 Civ. 022, 92 Civ. 1298, 1992 WL 240605, at *5, 1992 U.S.Dist. LEXIS 13502, at *15 (S.D.N.Y. Sept. 9, 1992). The then Judge Freeh continued to state that "where the offering materials contain considerable warnings and disclaimers, as in this case, plaintiffs are on notice of their injuries at the time of purchase." *Id.* 1992 WL 240605 at *5, 1992 U.S.Dist. LEXIS 13502, at *16 (citations omitted).

■ Under the objective inquiry rule for RICO claims, notice may be derived from: (1) the offering memorandum, *Dolan v. Rothschild Reserve International, Inc.,* 1991 WL 155770, at *1 (S.D.N.Y. Aug. 8, 1991) ("A reading of the PPM, the document which the complaint asserts that Dolan relied on, shows that each of the facts, transactions and events set out in the amended complaint as creating a cause of action, was fully disclosed in the PPM. As a matter of law then, plaintiff reasonably discovered what he alleges as fraud at the time of his investment."); (2) partnership communications, *Marlow v. Gold,* No. 89 Civ. 8589, 1991 WL 107268, at **8–9, 1991 U.S.Dist. LEXIS 8106, at **24–

27 (S.D.N.Y. Jun. 6, 1991) (holding plaintiff's potential fraud, or RICO claims, are time barred as fact sheet he relied upon referred to PPM); and (3) public knowledge. *See Global I,* 815 F.Supp. at 640.

■ Applying a similar objective inquiry rule, courts in this District have determined that inquiry notice, once established, bars RICO claims. *See, e.g., Henkind v. Brauser,* [1989 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,488, ¶ 93,122, 1989 WL 54109 (S.D.N.Y.1989) (Defendants' alleged predicate acts occurred at moment Plaintiff purchased securities.). *Center Cadillac Inc. v. Bank Leumi Trust Co.,* 808 F.Supp. 213, 225 (S.D.N.Y.1992) (barring RICO claims on injuries which occurred or should have been discovered more than four years in the past); *But see Landy v. Mitchell Petroleum Technology Corp.,* 734 F.Supp. 608, 618 (S.D.N.Y. 1990) (holding securities, but not RICO, statute of limitations had tolled due to their respective standards).[14]

■ As noted in *Testone v. Niagara Mohawk Power Corp.,* No. 91 CV–1042, 1992 WL 72145, at *7, 1992 U.S.Dist. LEXIS 3743, at *22 (N.D.N.Y. Mar. 26, 1992), "[o]n a motion to dismiss, when the facts alleged in the complaint indicate that, with reasonable diligence, plaintiffs should have uncovered the alleged fraud prior to the limitations period, the claim will be time[-]barred." (quoting *Griffin v. McNiff,* 744 F.Supp. 1237, 1255 (S.D.N.Y.1990)). "The test as to when fraud should with reasonable diligence have been discovered is an objective one." *Armstrong v. McAlpin,* 699 F.2d 79, 88 (2d Cir. 1983). Thus, "the commencement of the statutory period does not await a plaintiff's 'leisurely discovery of the full details of the alleged scheme.'" *Phillips v. Levie,* 593 F.Supp. 459 (2d Cir.1979), quoting *Klein v. Bower,* 421 F.2d 338, 343 (2d Cir.1970); *see also*

---

**14.** The *Landy* court acknowledged this apparent inconsistency:

"In this case, plaintiffs cannot be said to have learned of their injury, the loss of their investment and any possible benefits from that investment, until 1986, when the Internal Revenue Service disallowed their tax deductions. Thus, Plaintiffs' RICO claims cannot be said to be time barred. This is not inconsistent with the Court's finding above that plaintiffs' securi-

ties law claim accrued at the time of purchase. The statute of limitation for the securities law violation focuses on plaintiffs' knowledge of defendants' actions, while the RICO statute of limitation focuses on plaintiffs' knowledge of when they were actually harmed by those actions."

*Landy v. Mitchell Petroleum Technology Corp.,* 734 F.Supp. 608, 625 (S.D.N.Y.1990).

*Berry Petroleum Co. v. Adams & Peck*, 518 F.2d 402, 410 (2d Cir.1975).

■ Only factual allegations of fraudulent concealment will toll the four year RICO statute of limitations period under the objective discovery rule. The plaintiff must show an affirmative act on the part of the defendant to conceal the harm from the plaintiff in order to toll the statute of limitations since "[m]ere ignorance of evidence on which to establish a claim is not enough." *Cf. Moviecolor Ltd. v. Eastman Kodak Co.*, 288 F.2d 80, 87 (2d Cir.1961) (Friendly, J.) (holding that the doctrine of fraudulent concealment may toll the accrual of a cause of action in the antitrust context).[15] Similarly, in civil RICO securities cases, several courts in the Southern District have held that "[a] RICO cause of action accrues on the date of the last sale to plaintiffs, subject to tolling for fraudulent concealment." *Gould v. Berk & Michaels, P.C.*, 89 Civ. 5036, 1990 WL 41706 at *5, 1990 U.S.Dist. LEXIS 3655 at *16 (S.D.N.Y. Apr. 4, 1990); *See also Glick v. Berk & Michaels, P.C.*, No. 90 Civ. 4230, 1991 WL 152614, at *11, 1991 U.S.Dist. 10347, at *35 (S.D.N.Y. July 26, 1991); *Mazza v. Berk & Michaels, P.C.*, No. 90 Civ. 4066, 1991 WL 35837, at *5, 1991 U.S.Dist. LEXIS 3033, at *13–14 (S.D.N.Y. Mar. 8, 1991).

■ Accordingly, the doctrine of fraudulent concealment does not apply in circumstances where there is no basis to allege an omission since it "cannot be invoked where plaintiffs have notice of the facts underlying their claims." *O'Brien v. National Property Analysts Partners*, 719 F.Supp. 222, 232 n. 11 (S.D.N.Y.1989); *see also Gould v. Berk & Michaels, P.C.*, No. 89 Civ. 5036, 1990 WL

41706, at *5, 1990 U.S.Dist. LEXIS 3655, at *15 (S.D.N.Y. Apr. 4, 1990). "[A] plaintiff must demonstrate that it remained ignorant of the cause of action until a point in time less than four years prior to the commencement of the action, such ignorance not being attributable to any lack of diligence on the part of the plaintiff." *Companhia Siderurgica Nacional v. D.B. Orban Co.*, No. 90 Civ. 5661, 1991 WL 89645, at *5, 1991 U.S.Dist. LEXIS 6848, at *15–16 (S.D.N.Y. May 22, 1991) (citing *State of New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988), *cert. denied*, 488 U.S. 848, 109 S.Ct. 128, 102 L.Ed.2d 101 (1988)).[16] The issue, then, turns on whether the plaintiff had notice, or had notice that would have spurred a reasonable investor to inquire, about the alleged fraudulent acts.

### A. *Clovine/Ellingson Plaintiffs' RICO Claims Are Time Barred*

The *Clovine/Ellingson* action arises from a Connecticut limited partnership organized to acquire two parcels of land with several office buildings and to conduct various site improvements thereupon in Cincinnati, Ohio. Third Am.Compl. ¶ 24. Integrated Resources Equity Corporation, a wholly-owned subsidiary of Integrated, was the selling agent through which the Partnership sold its limited partnership interests to the *Clovine/Ellingson* Plaintiffs. Third Am.Compl. ¶ 5. Only "Accredited Investors" under Regulation D of the Securities Act of 1933 were allowed to participate in the investment.[17]

---

**15.** The doctrine of fraudulent concealment is read into all federally-created causes of action. *See Holmberg v. Armbrecht*, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946); *see also* Mary S. Humes, *RICO and a Uniform Rule of Accrual*, 99 Yale L.J. 1399, 1408–09 (1990) (discussing the antitrust origins of the doctrine of fraudulent concealment).

**16.** *Cf. Farr v. Shearson Lehman Hutton, Inc.*, 755 F.Supp. 1219, 1288 (S.D.N.Y.1991) (Conboy, J.) (holding fraudulent concealment not established in § 10(b) context because investor letters or "statements of cautious optimism, reiterations of the goal of providing income to investors, and explanations for past poor performance do not

rise to the level of affirmative concealment necessary to excuse a reasonable investor from the duty of inquiry") (footnote omitted).

**17.** Additional eligibility requirements included: combined federal and state income tax bracket of 45%; net worth greater that $250,000; aggregate net worth in excess of 5.25 times the investment; consultation with investors's own counsel and advisors with respect to the tax and other investment consequences; knowledge and experience in business and financial matters to evaluate the merits and risks of this investment; and an ability to bear the economic risks of a complete loss of such an investment. Clovine PPM at 1.

The Third Amended *Clovine/Ellingson* Complaint alleges, among other items,[18] that the Defendants' acts are a "scheme" to obtain income in violation of the federal securities and mail fraud laws constituting a racketeering activity within the meaning of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961(1)(B) and (1)(D).[19] The *Clovine/Ellingson* Complaint further alleges that Defendants misrepresented the Partnership's future viability and withheld market information regarding local vacancy and occupancy rates, overbuilding and unfavorable absorption rates. Third Am.Compl. ¶¶ 33–58. Specifically, the Complaint contends that Defendants overstated the projected future absorption rate and additionally failed to disclose that office vacancy rates in downtown Cincinnati at the time of the offering were approximately 17.9 to 19.1%. Third Am.Compl. ¶ 39. In addition, the Defendants allegedly continued the fraud by sending "misleading letters to each limited partner ... giving highly optimistic reports while misleading the members of the class." Third Am.Compl. ¶ 59. In alleging RICO injuries, the Plaintiffs contend:

> [t]he defendants caused the plaintiff's (sic) loss by investing money taken from Plaintiffs by securities fraud, a racketeering activity, in Clovine's real estate. The loss was also caused by the subsequent control of that partnership by the Integrated Defendants. The Integrated Defendants did not give the plaintiff limited partners information from which they might have been able to substitute management which would have acted in their interests; for instance, by selling the buildings prior to initiation of foreclosure proceedings.[20]

Mot. for Leave to Am., at 3–4; Third Am. Compl. ¶ 69B.

The *Clovine/Ellingson* Complaint alleges that Defendants' correspondence subsequent to the offering furthered their purported RICO conspiracy. As a factual basis for these allegations, the Complaint cites an excerpted language from the Clovine Partnership correspondence:

> The market in Cincinnati is very competitive due to an overabundance of new space that, to date has not been absorbed. Nonetheless, it is expected that absorption will increase at a faster pace than in the recent past.

Third Am.Compl. ¶ 60(b) (citing Def.s' Letter To Limited Partners, 12/19/86). The Complaint characterizes the statements in the December 19, 1986 letter as "project[ing] long term tightening of the market, which was contrary to the known facts and hence, clearly not going to happen in the foreseeable future." *Id.* In short, Plaintiffs complain that long term business projections did not materialize in the short run, a concededly frustrating event, but not a legally sufficient predicate act for RICO purposes. The only injury alleged by the Plaintiffs is the actual loss on their investment.

The Moving Defendants seek dismissal on two grounds: first, that the alleged fraud was merely an omission, corrected within a few months; and second, that the correction placed Plaintiffs on inquiry notice and as a result, the action is time barred.

The Plaintiffs were placed on inquiry notice when they invested in the Partnership

---

**18.** In *Global I,* this Court found the *Clovine/Ellingson* securities fraud claims "clearly barred by *Ceres.*" This Court noted that as the securities claims in *Clovine/Ellingson* alleged fraud and omissions "from sales which could at the very latest have taken place in 1986" and are time barred as the lawsuit was filed "in 1991, more than four years thereafter." *Global I,* 815 F.Supp. at 648 (S.D.N.Y.1993) (referring to *Ceres Partners v. GEL Assocs.,* 918 F.2d 349 (2d Cir. 1990) which adopted a uniform limitations period in § 10(b) actions).

**19.** Specifically, the Complaint alleges the following RICO claims:

71. The Defendants, as person [sic], conspired together to violate the provisions of 18 U.S.C. § 1962(c) and thus violated the provisions of 18 U.S.C. § 1962(d).

72. As a result of such Defendants' violations of 18 U.S.C. §§ 1962(c) and (d), Plaintiffs have been financially injured by the amount of their funds "invested", plus lost use of money invested, and consequential damages. Plaintiffs are further entitled to recover treble damages and attorneys fees pursuant to the statute.

Third Am.Compl. ¶¶ 71, 72.

**20.** According to the Third Amended Complaint "a foreclosure action was commenced against the Properties in January, 1991 and continues to the present." (Third Am.Compl. ¶ 58).

due to the statements made in the Clovine PPM [21] rather than in 1989 when they were advised of the necessity for asbestos removal.[22] The PPM, indeed, immediately emphasizes the risky nature of the investments as early as the second page:

> THE PURCHASE OF THE INTERESTS OFFERED HEREBY WILL ENTAIL A HIGH DEGREE OF RISK. (See "RISK FACTORS.")

Clovine Assocs. PPM, at ii.

■ Indeed, cautionary language is scattered throughout the PPM [23] and the ensuing partnership correspondence. Allegations in the Complaint itself show that as a matter of law, the Plaintiffs knew or should have known of the acts they allege are fraudulent at the time of their investment, or at least as of receiving Defendants' letter of February 26, 1986, outlining the vacancy rates in Cincinnati.[24] Third Am.Compl. ¶ 60(b); Rocano Aff., Ex. F, Def. Mot. to Dismiss at 3. The driving force behind the *Clovine/Ellingson* Complaint's allegations of fraud are that the Defendants failed to tell the Plaintiffs of the Cincinnati vacancy rates. Plaintiffs were expressly told that the market occupancy rates were 80%—thus the vacancy rates were 20%—and were put on inquiry notice by the letter. *See Anisfeld v. Cantor Fitzgerald & Co.*, 631 F.Supp. 1461, 1465–66 (S.D.N.Y. 1986) (holding that investors complaining of § 10(b) violations due to misrepresentation of occupancy rate were placed on inquiry note by the Investment Memorandum, financial statements, and correspondence).

Later Clovine investor correspondence from December of 1986 also served to alert Plaintiffs of their claims. In a letter to the investors, the Defendants reported that the average occupancy rate for Cincinnati had remained at 83%, or a 17% vacancy rate and that the office real estate market was "very competitive." Rocano Aff., Ex. F. at 3. Therefore, the Plaintiffs' contentions that the Defendants fraudulently misrepresented the occupancy rates in the Cincinnati real estate market cannot stand. Plaintiffs were on inquiry notice of the very facts they claim to be the fraud as early as February, but no later than the end of 1986, nearly five years before filing their Complaint.

Even if Plaintiffs were not actually aware of the alleged fraud, the combination of the PPM and the subsequent letters placed Plaintiffs "on notice that there were matters that should be investigated." *Dolan v. Rothschild Reserve Int'l, Inc.*, No. 90 Civ. 1003, 1991 WL 155770, at *2 (S.D.N.Y. Aug. 8, 1991); *accord Henkind*, [1989 Transfer Binder] Fed.Sec.Law Repts. (CCH), ¶ 94,488 at ¶ 93,122, 1989 WL 54109 (S.D.N.Y.1989) (RICO claim accrued when "reasonable investor" would have inquired). As in *Dolan*, "plaintiffs' mere conclusory allegations that

---

21. The PPM may be considered by the court on a motion to dismiss. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir.1991) (as "[t]he prospectus is integral to the complaint ... We therefore decline to close our eyes to the contents of the prospectus and to create a rule permitting a plaintiff to evade a properly argued motion to dismiss simply because plaintiff has chosen not to attach the prospectus to the complaint or to incorporate it by reference.").

22. Plaintiffs do not allege facts that Defendants fraudulently concealed the asbestos problem from the partnership investors.

23. Typical of cautionary language directed toward potential investors are the following excerpts from the Clovine PPM:

> There can be no assurance that the tax benefits available under current law will continue to be available in the future, or that the current

proposed changes in the tax law or other legislative, administrative or judicial changes may not be forthcoming. Clovine PPM at 37.

> The actual results of operations of the Property, being dependent upon economic and competitive conditions prevailing generally and in the area in which the Property is located, cannot be predicted with any degree of certainty. Clovine PPM at 76.

> Because the successful operation of the Property will depend upon many factors over which the Partnership will have little or no control, no assurance can be given that future operating results will match the projections contained herein. Clovine PPM at v.

24. This letter noted that the 97% occupancy rate in the Clovine buildings was "unusually high percentage for any office building in the U.S., and particularly for Cincinnati where the average rate of occupancy is 80%." Rocano Aff., Ex. F, Def. Mot. to Dismiss, at 3.

they were unable to discover the fraud are insufficient to raise a material issue of fact on the subject of discovery." *Dolan* at *2.

█ Plaintiffs are, by definition, sophisticated investors, once on inquiry notice they were under an obligation to learn more about the alleged market conditions or file suit within the statute of limitations. *Cf. Marlow*, No. 89 Civ. 8589, 1991 WL 107268, at *9–10, 1991 U.S.Dist. LEXIS 8106, at *28 (S.D.N.Y. Jun. 6, 1991) (taking into account the sophistication of the investor when considering notice); *Treacy v. Simmons*, No. 89 Civ. 7052, 1991 WL 67474, at **4–6, 1991 U.S.Dist. LEXIS 5362, at **11–16 (S.D.N.Y. Apr. 23, 1991) (investor's failure to read risks disclosed in prospectus upon reliance on broker's oral statements "unjustifiable"; plaintiff's assertion that he is unsophisticated investor rejected given his business background).

█ Once Plaintiffs are placed on inquiry notice of their RICO claims, alleged subsequent reassurances cannot be invoked to further toll the limitations period. *Marlow*, No. 89 Civ. 8589, 1991 WL 107268, at **3–10, 1991 U.S.Dist. LEXIS 8106, at **9–30 (S.D.N.Y. June 6, 1991). Thus, once notified of their potential RICO claims, Plaintiffs "may not rely on allegations of fraudulent concealment to avoid the limitations bar unless they exercised due diligence in attempting to ascertain the facts related to the alleged fraud, but were nevertheless unable or prevented from discovering the nature of their claim." *Griffin*, 744 F.Supp. at 1256. In short, "Plaintiffs bear the burden of proving that they exercised reasonable diligence once events trigger[ ] a duty of inquiry." *Henkind v. Brauser*, [1989 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,488, ¶ 93,122, 1989 WL 54109 (S.D.N.Y.1989).

Here, the *Clovine/Ellingson* Plaintiffs have neither alleged any reasonable diligence in inquiring about their claims, nor have they alleged affirmative conduct by Defendants to prevent Plaintiffs from discovering the facts underlying their present claims. As pointed out above, the record establishes that Plaintiffs were placed on inquiry notice of the facts underlying their sole alleged RICO injury more than four years before filing their action. As a result, the *Clovine/Ellingson* Plaintiffs' RICO claims are time-barred.

### B. *Two–Tier Plaintiffs' RICO Claims are Time Barred*

The *Two–Tier* RICO Complaint, brought on behalf of 118 Plaintiffs, was filed on December 19, 1991. The Complaint asserts securities, mail and wire fraud as predicate acts for RICO claims concerning the syndication of five real estate limited partnerships in 1983 and 1984.[25] The gravamen of the Complaint alleges that:

> Contrary to the portrayal of investment in the Partnerships as containing certain safeguards and guarantees, however, the Partnerships had none of these protections since defendants' actions, in total contradiction to the representations made to plaintiffs, stripped the Partnerships of these safeguards by negotiating the assets (i.e. the limited partners' contributions and promissory notes) to third parties and "upstreaming" the cash obtained therefrom to Integrated for general corporate and other purposes that were unrelated to the Partnerships.

Compl. ¶ 21.

The *Two–Tier* Complaint alleges that the offering memoranda for the *Two–Tier* partnerships failed to disclose that Defendants intended to use the partnership notes, pledged to Defendant Resources Funding Corporation, for non-partnership purposes.

---

**25.** The five limited partnerships are: (1) Essex Care Associates ("Essex"), organized to rehabilitate, own and operate a 420–bed nursing home and geriatric day care center in Newark, NJ, invested in December, 1983; (2) Greenhouse II Associates L.P. ("Greenhouse"), organized to purchase, own and manage a 322–unit rental apartment complex in Boston, MA, invested in November, 1984; (3) Printer's Plaza Associates L.P. ("Printer's Plaza"), organized to develop, construct, own and operate a 330–unit residential development in Chicago, Illinois, invested in March, 1984; (4) Willowick Associates L.P. ("Willowick"), organized to purchase, own and manage a residential housing development in Willowick, Ohio, invested in December, 1983; (5) Winter Lake Associates L.P. ("Winter Lake"), organized to purchase, own and mange residential rental high rise in Willoughby Hills, Ohio, invested in July 1984. Compl. at ¶¶ 4–8, 13.

Instead of using the *Two–Tier* partnership notes, and resultant income stream, to pay down its remaining obligations on the original purchase, Resources Funding Corporation negotiated the partnership notes to banks and transferred the proceeds to Integrated. This alleged "upstreaming" of the partnerships' assets to Integrated purportedly left Resources Funding Corporation without the financial wherewithal to meet its obligations to the original seller, and thus placed the *Two–Tier* investments in jeopardy of foreclosure.[26]

■ According to the *Two–Tier* Complaint, Plaintiffs' alleged RICO injury occurred in February, 1990, with the announcement of Integrated's bankruptcy, Compl. ¶ 29, and the "[t]he fraudulent concealment by defendants, and plaintiffs' due diligence in attempting to uncover the true facts surrounding their investments, tolled the running of any applicable statute of limitations until ... February 1990." Compl. ¶ 34.

Even assuming that the limited partnership notes are non-negotiable, the Plaintiffs were placed on inquiry notice, if not actual notice, of facts the Plaintiffs now claim to be fraudulent and the injury occurred at the time of investment—not at the time of Integrated's declaration of bankruptcy. The Essex PPM, for example, disclosed to investors "RFC's ability to negotiate and/or pledge the notes." Essex PPM at 27. The PPM further described the notes as "unconditional" and "negotiable." *Id.* at 97. Further, investors were informed that:

> The Notes (and any collateral securing them) may be negotiated or used as collateral for borrowings by the Partnership or any of its Affiliates, as the case may be, or for the payment of their respective obligations whether arising hereunder or otherwise. The Notes will be pledged to RFC

to secure the payment of the Purchase price.

*Id.* at 98.[27]

The Complaint alleges that the Defendants committed a fraud by assigning allegedly non-negotiable notes and therefore the Plaintiffs could not be on notice because the Defendants violated the agreements upon which they relied.[28] These allegations are undermined, however, by the fact that the PPM stated that the limited partnership notes were indeed assignable and negotiable.

■ The Plaintiffs' Memorandum of Law varies their Complaint's earlier misrepresentation allegations by claiming that in "the *Two–Tier* complaint ... defendants failed to disclose in the Memoranda that they intended to use partnership notes or their proceeds ... to prop up Integrated Resources without regard to partnership purposes or obligation." Pl.Mem. of Law at 47. The omission is therefore not the ability to negotiate the notes, but rather the intent to negotiate them for the benefit of Integrated. However it is viewed, the PPM placed the investors on inquiry notice that their notes could be negotiated for whatever purpose. Therefore, Plaintiffs knew or should have known of their alleged RICO injuries at the time they purchased their investments and gave their notes in 1983 and 1984, and accordingly their RICO claims are time barred.

### C. *Net Lease Plaintiffs' RICO Claims Are Time Barred*

The First *Net Lease* Complaint was filed on January 2, 1992, followed by an Amended Complaint on February 7, 1992. Plaintiffs filed a motion for leave to file their Second Amended Complaint on April 15, 1993. The Moving Defendants do not object to Plaintiffs' motion for leave to file the Second Amended Complaint, but have filed a motion to dismiss it in its entirety. Plaintiffs' mo-

---

26. The claim that Integrated developed a series of real estate limited partnerships in order to "upstream" capital to the umbrella corporation is the basis for what has come to be known as the "Mother Integrated" theory.

27. The PPM for the other *Two–Tier* Partnerships contained similar disclosures. *See e.g.* Winter Lake PPM at 2, 24, 80–81; Willowick PPM at 2,

24, 89–90; Greenhouse II PPM at 6, 89–90; Printer's Plaza PPM at 2, 23, 87–88.

28. "[D]efendants knew that RFC had violated its agreements with the Partnerships and had pledged the investor notes to third parties for the benefit of Integrated alone and not the Partnerships." Compl. at ¶ 30.

tion for leave to file the Second Amended Complaint [29] is granted. The Moving Defendants' Motion to Dismiss the Second Amended Complaint's RICO claims, for the reasons set forth below, is also granted.

The *Net Lease* Second Amended Complaint alleges that Defendants committed securities, mail and wire fraud predicate acts under RICO in seven limited partnership offerings [30] in which the six named Plaintiffs [31] invested. The named Plaintiffs invested in the limited partnerships in question between 1983 and 1984. Second Am.Compl. ¶¶ 5–9. The *Net Lease* Complaint alleges RICO and state-law claims as a class action on behalf of investors in 150 similarly structured limited partnerships.

The *Net Lease* Partnerships were syndicated between 1979 and 1985 to acquire commercial real estate properties that were leased back to the seller on a triple-net basis. The Complaint alleges the *Net Lease* Partnerships were structured as follows: an Integrated subsidiary purchased commercial real estate and resold it to the Partnership, with a portion of the purchase price deferred; a master lease was entered into between the Partnership and a second Integrated subsidiary that, in turn, subleased the property back to the original seller; a third Integrated subsidiary guaranteed the rental payments owed to the Partnership by the second Integrated subsidiary under the master lease. Second Am.Compl. ¶¶ 22–29.

The Complaint further contends that: [t]he Offering Materials ... did not disclose that Integrated would not be able to fund the demand notes if it did not syndicate new partnerships and therefore the value of the guarantees was also contingent on the constant formation of new syndications—a Ponzi scheme.

Second Am.Compl. ¶ 53. In short, the Complaint alleges that the master lease guarantees given by Integrated subsidiaries to the Partnerships were "entirely illusory and of no force and effect", Second Am.Compl. ¶ 49, since Integrated's financial arrangements and the transactions involving the Partnerships were allegedly structured with the specific intent of depriving the guarantor-subsidiaries of the required funds to fulfill their obligations, Second Am.Compl. ¶¶ 44–49, and finally, Defendants "fraudulently concealed their fraud." [32] Second Am.Compl. ¶ 57.

However, Integrated disclosed these accounting methods in its Annual Form 10–K statements filed with the Securities and Exchange Commission ("SEC").[33] The existence of the Form 10–Ks and other documents were described in the *Net Lease* Partnerships' PPM describing the documents as available for public inspection with the SEC.

■ In securities actions, the Second Circuit permits district courts to take judicial notice of federally mandated disclosure documents on motions to dismiss, even if such documents are not included in the complaint. *See Menowitz v. Brown,* 991 F.2d 36, 39 (2d Cir.1993) (affirming district court's holding federally mandated disclosure documents "placed plaintiffs on inquiry notice of the probable existence of their claims"); *Kramer*

---

**29.** As no new parties are added in the Second Amended Complaint, notice concerns do not bar its entry in this action. *Cf.* Discussion of *RAM/Pate supra.*

**30.** The seven limited partnerships in controversy are: Oakbay Associates Limited Partnership ("Oakbay"); Syrcar Associates Limited Partnership ("Syrcar"); Calcraf Associates Limited Partnership ("Calcraf"); Sunway Associates Limited Partnership ("Sunway"); Segair Associates Limited Partnership ("Segair"); Vegpow Associates Limited Partnership ("Vegpow"); and JVF Associates Limited Partnership ("JVF").

**31.** The named plaintiffs are: Clayton Neuman of Minnesota, John J. Higgins of Nebraska, John S. Okun of Nebraska, Patrick W. McCarty of Ohio,

Andy Briant of California, and Alan Kadet of Illinois.

**32.** Defendants' alleged fraudulent concealment consisted of: sending out affirmatively misleading annual reports; failing to file SEC documents after commencement of bankruptcy proceedings between 1990 and late 1992; sending letters containing false information about Beigel & Sandler; instituting frivolous litigation against Beigel & Sandler; and utilizing the auspices of the Bankruptcy Court to avoid disclosure of financial information. Second Am.Compl. ¶ 57(a)–(e).

**33.** Copies of Integrated Resources' 1982 through 1987 Form 10–K's are attached to Defendants' motion to dismiss (Exhibits A through F).

*v. Time Warner Inc.*, 937 F.2d 767, 769–70 (2d Cir.1991) ("We hold that a district court may consider relevant documents required by the securities laws to be filed with the Securities and Exchange Commission ("SEC") in determining a motion to dismiss a complaint alleging material misrepresentations and omissions in such documents."); *Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir.1991) ("[W]hen a district court decides a motion to dismiss a complaint alleging securities fraud, it may review and consider public disclosure documents required by law to be and which actually have been filed with the SEC ...").[34]

■ In *Kramer*, the Second Circuit held that SEC filed documents may be considered as "no serious question as to their authenticity can exist." *Kramer*, 937 F.2d at 774. The *Kramer* court further noted that such public documents are the very documents alleged to contain the misrepresentations and omissions and are "relevant not to prove the truth of their contents but only to determine what the documents stated." *Id.* Similarly, this reasoning is equally relevant when considering the effects of RICO pleadings in the securities context. Accordingly, the contents of publicly filed SEC documents placed Plaintiffs on constructive notice of their RICO claims at the time of their purchases.

"[A] plaintiff whose complaint alleges that such documents are legally deficient can hardly show prejudice resulting from a court's studying of the documents." *Id.* As the PPMs directed the *Net Lease* Plaintiffs to the SEC filed documents, they may not successfully challenge their review upon a

motion to dismiss. *Cf. Field v. Trump*, 850 F.2d 938, 949 (2d Cir.1988) ("[W]e may of course refer to the Offer to Purchase and the 1984 Proxy Statement, which were annexed to defendants' motion to dismiss and are documents that are integral to the plaintiff's claims."), *cert. denied*, 489 U.S. 1012, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989).

For example, Integrated's 1982 Form 10–K described its "Significant Accounting Policies" as follows:

*Revenue Recognition*

*Income From Investment Programs*

 \* \* \* \* \* . \*

*Deferred fees and deferred contract rights represent the present value of future amounts to be received as rental proceeds, amounts payable by limited partnerships out of future rentals and proceeds to be realized upon disposition of the property at the termination of the related leases.*

1982 Form 10–K at 37 (emphasis added). In addition, Defendants cite to the operating statement in the 1982 Form 10–K which also disclosed that revenues from the Integrated investments "include organizational and property acquisition fees, ... deferred contract rights [and] deferred fees." 1982 Form 10–K at 4.[35]

The 1983 Form 10–K reiterated the statements described above in the 1982 Form 10–K,[36] but proved to be even more detailed in its description of the accounting of future revenues:

> The Company's revenues from its privately offered investment programs are derived from limited partnerships organized by the Company which acquire commercial real estate properties.... The Company recognizes on a present value basis a portion of its fees from these programs in the form of deferred contract rights and deferred fees payable to the Company upon which interest accrues and which are payable out of future rentals under existing noncancellable leases, and future rentals under lease renewals or the proceeds to be realized from property dispositions.

1982 Form 10–K at 8; *see also id.* at 5, 30.

---

**34.** Numerous district courts in the Second Circuit have followed *Kramer*'s holding that public documents may be considered on Rule 12(b) motions to dismiss. *See, e.g., In re General Dev. Corp. Bond Litig.*, 800 F.Supp. 1128, 1135 (S.D.N.Y.1992); *Ferber v. Travelers Corp.*, 802 F.Supp. 698, 702 (D.Conn.1992); *Walsh v. Chittenden Corp.*, 798 F.Supp. 1043, 1048 n. 3 (D.Vt. 1992); *United States v. District Council of New York City & Vicinity of United Bhd. of Carpenters & Joiners*, 778 F.Supp. 738, 749 n. 3 (S.D.N.Y. 1991).

**35.** The 1982 Form 10–K described the reporting of deferred income as part of present revenues in at least three other instances:
*Privately Offered Investment Programs*
*Commercial Net Leased Real Estate Programs.*

**36.** *See, e.g.* 1983 Form 10–K at 4, 5, 33.

*Privately Offered Investment Programs Commercial Net Leased Real Estate Programs.*

The Company's revenues from its privately offered investment programs have been primarily derived from limited partnerships organized by the Company which acquire commercial real estate properties which are net leased to the seller or an affiliate of the seller.... *The Company recognizes on a present value basis a portion of its fees from these programs in the form of deferred contract rights and deferred fees payable to the Company upon which interest accrues* and which are generally payable commencing after the fifteenth year out of future rentals under existing noncancellable leases, and future rentals under lease renewals or the proceeds to be realized from property dispositions....

1983 Form 10–K at 8.[37]

The overall effect of booking future income as present revenue was disclosed in the 1984 Form 10–K:

Integrated believes that it will continue to require funds from sources other than operations in order to finance its operations. In addition, the Company anticipates that it will require funds to finance the acquisition of properties by limited partnership units prior to sales of limited partnership units in such partnerships and for other purposes.

1984 Form 10–K at 40.

Finally, the Plaintiffs' allegation that the alleged fraud "was only discovered by plaintiffs shortly before the filing of the original complaint," Second Am.Compl. ¶ 57, is contradicted by their own expert witness' affidavit. After studying the structure of one of the *Net Lease* Partnerships and the Second Amended Complaint, the Plaintiffs' expert witness has stated that "on the facts as al-

leged by plaintiffs, a limited partner owning a partnership interest in one of the *Net Lease* partnerships has *suffered damage at the time of its acquisition* by virtue of the absence of a substantive economic guarantee." Norton Aff. ¶ 8 (emphasis added). Thus, as the Plaintiffs apparently concede, any RICO injury which might have occurred, accrued at the time of investment.

The information and disclosures in the PPMs and Integrated's Form 10–Ks provided Plaintiffs with all the facts they used to make their fraud allegations. The *Net Lease* Plaintiffs simply may not escape the determination that they were on inquiry notice at the time they invested, some eight or nine years before this action was filed. No adequate claims of fraudulent concealment or additional RICO injuries have been put forward in the Complaint. The Plaintiffs with "reasonable diligence" could have discovered at the time of their investment the alleged fraudulent acts which they claim to have so recently discovered. *See Griffin v. McNiff,* 744 F.Supp. 1237, 1255 (S.D.N.Y.1990).

▇▇ Therefore, as the *Net Lease* Plaintiffs' RICO claims are predicated on the alleged fraudulent inducement to invest, and all relevant information to the alleged fraud was available to Plaintiffs respecting their limited partnership investments from the Offering Memorandum and publicly filed SEC Form 10–Ks as of the time of their investment in 1983 through 1984, their RICO claims are time barred.

### D. *RAM 86 Plaintiffs' RICO Claims Are Time Barred*

The *RAM/Pate* Plaintiffs filed their original complaint on December 18, 1991. On April 6, 1992, the Anderson Kill and Integrated Defendants filed a second notice of motion, now known as the Global Motion III, and memorandum of law dismissing Plain-

---

**37.** The "Significant Accounting Policies" section of the 1983 Form 10–K states:

*Revenue recognition*
*Income from investment programs*
 ⁎ ⁎ ⁎ ⁎ ⁎ ⁎

Amounts to be received as rental proceeds, amounts payable by limited partnerships out of future rentals and proceeds to be realized upon

disposition of the property at the expiration of the related fixed non-cancelable triple net leases are recorded at present values based primarily on the interest rate of long-term debt incurred by limited partnerships in connection with the purchase of properties. 1983 Form 10–K at 41.

tiffs' RICO claims. On April 10, 1992, Defendant Rosenberg and Rosenberg, Ltd, filed a notice of motion and memorandum of law dismissing Plaintiffs' RICO claims. On June 29, 1992 Plaintiffs submitted a memorandum in opposition of Global Motion III. On September 4, 1992, reply memorandums from the Anderson Kill and Integrated Defendants as well as a separate reply memorandum from the Rosenberg Defendants were submitted. More than one year after Defendants' filing of Global Motion III, on April 16, 1993, Plaintiffs moved to amend, pursuant to Fed.R.Civ.P. Rule 15(a), the *RAM/Pate* Complaint, to add 166 Plaintiffs and to establish a purported class of investors who have not yet been identified. The Anderson Kill, Integrated Defendants and Rosenberg Defendants have opposed Plaintiffs' 15(a) motion. The motion was deemed submitted as of July 30, 1993.

### 1. *Leave To Amend The RAM/Pate Complaint Is Denied*

■ Despite the liberal policy toward amendment embodied in Rule 15(a) of the Federal Rules of Civil Procedure, "leave to amend should not be granted where it is futile." *Bruce v. Martin,* 702 F.Supp. 66, 69 (S.D.N.Y.1988); *see Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *Albany Ins. Co. v. Esses,* 831 F.2d 41, 45 (2d Cir.1987). Further, leave to amend is properly denied when the amended complaint "would not survive a motion to dismiss." *Prudential Ins. Co. v. BMC Indus., Inc.,* 655 F.Supp. 710, 711 (S.D.N.Y. 1987).

Leave to amend the *RAM/Pate* Complaint is denied with respect to the RAM 86 partnership as these RICO claims are time barred and any amendment thereof would be futile. Leave to amend is permitted for the RAM 2 Plaintiffs, even though the original *RAM/Pate* Complaint did not give the Collective Defendants any notice of additional new Plaintiffs and potential class-wide relief. As the RAM 86 and RAM 2 Plaintiffs' claims appear to be inextricably intertwined at this stage, the merits of the RAM 2 Plaintiffs' claims are not addressed in this Opinion. However, leave to amend the *RAM/Pate* Complaint is granted in order to distill the claims of the RAM 2 Partnership Plaintiffs.

### 2. *The Ram 86 Plaintiffs' RICO Claims*

RAM 86 was a limited partnership created to extend mortgage loans to Integrated's affiliates. The partnership's investment strategy consisted of making interest compounding, zero coupon loans with maturities of approximately twelve years.[38] RAM 86 PPM at 6, 38. Plaintiffs invested in RAM 86 between January 1986 and May 1, 1987. Compl. ¶ 4. The *RAM 2* Plaintiffs purchased their limited partnership units as late as September, 1989. For the reasons set forth below, Plaintiffs' RICO claims for RAM 86, but not for RAM 2, are barred by the statute of limitations.

Both the original and proposed RAM Complaints allege that RAM 86 was designed "from the outset principally to permit Integrated to 'cash-out' the uneconomical mortgages that it and its affiliates held in other Integrated-sponsored partnerships." Compl. ¶ 16. *See also* Compl. ¶¶ 19, 23(a); Am. Compl. ¶¶ 27, 34, 43, 50(c), 50(d). The Complaints also allege that Defendants misrepresented RAM 86 as a "safe" investment, Compl. ¶¶ 17, 19, 22 and 29(c); Am Compl. ¶ 45(d), with a guaranteed 10% return and an anticipated 12% return, Compl. ¶¶ 11, 16, 22(a) and 29(a). Finally, the Complaints al-

---

**38.** The RAM 86 Partnership invested mortgage loans in the following 16 Integrated properties: (1) Brentwood Place, owned by BP Shopping Center Associates L.P.; (2) Central Trust & Clopay building, owned by Clovine Associates L.P.; (3) Century Park II, owned by San Diego Associates L.P.; (4) 595 Madison Avenue, owned by 595 Investors L.P.; (5) Great Western Building, owned by Berkeley Western Associates L.P.; (6) Kingswood Bellekirk, owned by Bellekirk Associates L.P.; (7) Lenox Towers, owned by Lenox Towers Associates L.P.; (8) Los Angeles Airport Center, owned by Airport Center Associates L.P.; (9) Park Place Mall, owned by Park Place Mall Associates L.P.; (10) Pierre Bossier Mall, owned by Bossier Plaza Associates L.P.; (11) Pike Creek, owned by Big Valley Associates L.P.; (12) Research Triangle, owned by Research Triangle Associates L.P.; (13) Southern Inns, owned by Southern Inns Associates L.P.; (14) Stockdale Corp. Tower, owned by Stockfield Associates L.P.; (15) Tri–State Retail, owned by Pace Associates, L.P.; and (16) West Palm apartment complex, owned by West Palm Associates L.P.

lege Integrated's financial health was misrepresented, and as a result, it was unable to honor its guarantees, Compl. ¶¶ at 10, 12, and 23(b); Am.Compl. ¶ 51(g).

### 3. *The RAM 86 Prospectus Disclosed "Cash Out" Transactions*

Both the original and proposed RAM Complaints allege that the RAM Partnerships issued loans to other Integrated sponsored partnerships, which then used the proceeds of such RAM loans to repay an "uneconomical" pre-existing mortgage obligation owed to an Integrated affiliate: the "cash out" transactions. The proposed amended Complaint alleges that the clandestine purpose of the Partnerships was to effectuate these cash out transactions, and that this purpose was misrepresented by the partnerships who failed to disclose their fraudulent intent. *See* Am.Compl. ¶¶ 43; 50(c), (d).

The Defendants concede that the RAM Partnership extended loans used to repay outstanding obligations to the affiliates of the general partners, but claim that the disclosure of these practices in the RAM 86 Prospectus, dated January 21, 1986 foils Plaintiffs' RICO claims. According to the "Conflict of Interest" section, early in the RAM 86 Prospectus, the Partnership's stated intent was to:

> ... invest principally in Mortgage Loans on properties owned or acquired by privately syndicated limited partnerships sponsored by Affiliates of the General Partners. Every transaction entered into between the Partnership and Affiliates of the General Partners is subject to an inherent conflict of interest.

RAM 86 Prospectus at 14. A few pages later, in a sub-section called "Other Transactions with Affiliates," the Prospectus states that the Partnership "may make a Mortgage Loan which enables the borrower to repay obligations to another affiliated entity." *Id.* at 16; *see also id.* at 41. Furthermore, the Prospectus disclosed that many of the affili-

ates were having financial problems. *Id.* at 27–29.

The proposed amended Complaint alleges that Integrated failed to disclose that an employee had prepared "projections" and an "analysis" respecting certain potential RAM 86 loans. But the RAM 86 Prospectus explicitly discloses that "the Managing General Partner is currently seeking suitable investments [but] no agreements or understandings have been reached for any specific investment except as set forth in any supplement to this Prospectus." RAM 86 Prospectus at 23. *Cf. Global I,* 815 F.Supp. at 675 (dismissing Plaintiffs §§ 10(b) and 12(2) claims in *Lenox* which did not cite any internal statement establishing a knowing misstatement in the PPM); *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 267 (2d Cir.1993) (holding that the "attributed public statements lack the sort of definite positive projections that might require later correction. The statements suggest only the hope of any company, embarking on talks with multiple partners, that the talks would go well.").[39]

The original RAM 86 Complaint also alleges that the fees charged by the general partners and the Integrated affiliates were excessive. Compl. ¶ 29(b). However, the Prospectus states that only 87.25% of the funds raised would be invested, and that the fee structure was not the result of an "arm's-length negotiation." *See* RAM 86 Prospectus at 2, 10, 11–14.

### 4. *Allegations Concerning RAM 86's Financial Condition Do Not State a Claim*

The Plaintiffs' claim that Integrated's financial health was somehow misrepresented cannot prevail here. The RAM 86 Prospectus informed potential investors that Integrated was a "publicly-held corporation whose common stock is traded on the New York Stock Exchange," with financial information publicly filed with the SEC. RAM 86

---

**39.** The claim that the Defendants failed to disclose that the mortgage loan arrangement was "designed from the outset principally to permit Integrated to "cash-out" the uneconomical mortgages" that it held in other Integrated sponsored partnerships cannot be converted into actionable

RICO or securities fraud claims. *See Bamco 18 v. Reeves,* 675 F.Supp. 826, 830 (S.D.N.Y.1987) ("civil RICO's treble damage provision was never intended to permit recovery for what amounts to common law fraud").

Prospectus at 35. Integrated's accounting practices were fully disclosed in these filings. As a result, while concededly perhaps not the best of investments, claims that RAM 86's or Integrated's financial structure was somehow fraudulently concealed are simply untenable—given Defendants' disclosures, described above.

The proposed amended complaint, like the original complaint, further alleges that Integrated's financial condition was not accurately disclosed. *See, e.g.* Am.Compl. ¶¶ 43, 51(c), (g), (h), 53. However, the *RAM/Pate* Plaintiffs still fail to account for the fact that each RAM Prospectus contained complete and current summaries of Integrated's financial condition as reported in its public SEC filings and financial statements. As nothing in the RAM Prospectuses or Integrated's Form 10-Ks respecting Integrated's finances are alleged to be false, allegations of alleged fraud which was available for public and investor consumption, are futile.[40]

40. For example, the Amended Complaint alleges that Integrated was suffering undisclosed cash flow problems due to the decreased revenues from real estate syndications and increased reliance on debt financing. *See e.g.* Am. Compl. ¶¶ 27, 51(c). However, decreasing revenues were reported in both the 1985 and 1986 Form 10-K which disclosed that: equity raised from Integrated commercial real estate programs "declined substantially" from 1984; its revenues were highly dependent upon revenues from such programs; and revenues on privately offered commercial real estate program declined from $151,205,000 to $81,456,000. *See, e.g.,* 1985 Form 10-K at 5-7.

41. For example, the "Risk Factors" section notified Plaintiffs of a host of potential pitfalls presented by investment in the partnership. This section warned investors to "consider the following risks, among others, before making a decision to purchase Units." RAM 86 Prospectus at 20. The PPM then detailed those risks, which included the following: (1) Tax Risks; (2) Transactions with Affiliates—loans would primarily be made to Affiliates of the General Partners; (3) Concentration Risks—the Partnership intended to invest all or substantially all of the assets in Mortgage Loans; (4) Deferral of Distributions— no expectation of distribution from the Partnership to the Limited Partners for at least ten to twelve years from the funding of the Mortgage Loans; (5) Reliance on and Experience of Management—the Investment General Partner was responsible for the selection, evaluation, negotiation and disposition of Mortgage Loan investments; (6) General Risks of Financing Real Estate—all Mortgage Loans are subject to some

## 5. RAM 86's Risk Level Was Not Misrepresented

Plaintiffs' claim that RAM 86 was characterized as a safe investment is refuted by numerous disclosures in the RAM 86 Prospectus.[41] In fact, the PPM repeatedly highlighted the high risk nature endemic to the Partnerships investment strategies. In the investor "Question and Answer" section, the Prospectus cautions that:

> There are certain risk and potential conflicts of interest associated with ownership of real estate mortgages. Prospective investors should read the section of the prospectus entitled "Risk Factors" and "Conflicts of Interest" carefully before purchasing.

RAM 86 Brochure/Prospectus at 8. In the section of the Prospectus entitled "Summary of Offering" immediately after the stated three prong objectives[42] a bold, all-capital-

degree of risk, including the risk of a default by the borrower and the general risks outside of the Partnership's control, including *economic conditions*, neighborhood values, *interest rates*, real estate tax rates, etc.; (7) Risks of Mortgages with Deferred Payments—deferral creates a risk that the borrower may not have sufficient funds to repay the Mortgage Loan at maturity; (8) Default by Mortgagor and Foreclosure—In the event of a default which causes the Partnership to foreclose on the property the Investment General Partner will seek to obtain a purchaser for the property, however, there can be no assurance that the amount realized from such sale will result in profit or prevent loss to the Partnership. In addition, because of potential adverse economic conditions, the Partnership may be forced to operate the property for a time and may need to borrow money to cover the costs of such operation; (9) Economic Conditions—The real estate industry and the kinds of investments which will be made by the Partnership in particular may be affected by prevailing interest rates, the availability of funds and the generally prevailing economic environment, as a result, the Partnership is unable to predict the effect, if any, the prevailing economic conditions will have on its ability to make Mortgage Loans or on the operation of its properties subject to its investment; and (10) Unspecified Investments. RAM 86 Prospectus at 20-25.

42. The stated three objectives of RAM 86 are: (1) to preserve and protect the capital; (2) to receive accrued interest, and (3) to provide for possible interest payable. RAM 86 Prospectus at 6.

ized print warning emphasizes that: "THERE CAN BE NO ASSURANCE THAT SUCH OBJECTIVES WILL BE ATTAINTED." RAM 86 Prospectus at 6; *see also id.* at 1, 37.

The economic impact of the fluctuations in the real estate market and possible tax reforms were referred to throughout the RAM 86 Prospectus. The possibility of tax reform, and the effect it would have on real estate and specifically on the Partnership was discussed in the Risk Factors section, in a subsection entitled "Possible Tax Reform" [43] as well as the "Income Tax Consequences" [44] section. These sections warned that tax reforms could cause the:

> value of real estate, in general, to decline. Such a decline in value of the underlying properties could affect the ultimate payment of the Mortgage Loans and could reduce the amount of Additional Interest payable to the Partnership.

*See* RAM 86 Prospectus at 60. Further, at periodic intervals, Partnership "Supplements" were released which advised investors of the impact of tax reforms as they developed.[45] Accordingly, it appears that Plaintiffs were made aware of the risks associated with an investment in RAM 86, and, nonetheless, decided to participate in the venture.

### 6. *RAM 86's Return on Investment Was Not Misrepresented*

Although Plaintiffs allege that they were fraudulently led to believe that a return of 12% could be expected, the Prospectus states in bold, all-cap letters that "THE USE OF FORECASTS IN THIS OFFERING IS PROHIBITED. ANY REPRESENTATION TO THE CONTRARY AND ANY PREDICTION, WRITTEN OR ORAL, AS TO THE AMOUNT OR CERTAINTY OF ANY PRESENT OR FUTURE CASH BENEFIT OR TAX CONSEQUENCE WHICH MAY FLOW FROM AN INVESTMENT IN THIS PROGRAM ARE NOT PERMITTED." RAM 86 Prospectus at 3.

Further, the contents of the RAM 86 Prospectus and SEC required public filings contradict Plaintiffs' RICO allegations. The Moving Defendants note that RAM 86's Form 10–K for the year 1986 discloses that the net income per limited partnership unit was $14.97 for 1986, a 7% annual return per unit (as weighted to reflect the 11 months of the Partnership's existence). See RAM 86 1986 Form 10–K at 13. This 7% rate of return was maintained for each of the ensuing quarters in 1987.[46] Accordingly, as the rates of return were well below the rates the Plaintiffs allege were guaranteed by the Prospectus, the SEC's public disclosures put them on notice of their claims as early as 1986 and no later than 1987.

As described above, the RAM 86 Plaintiffs were placed on notice of their RICO allegations at the time of their RAM investments or shortly thereafter. Although the first Complaint alleged that the Plaintiffs were not told that RAM would issue the loans to "cash out" positions held by Integrated, these facts were clearly disclosed in the Prospectus, and thus Plaintiffs were on notice of their claims from the time of their investment or soon afterwards. In the same vein, Plaintiffs alleged fraud in the first complaint as to the safety, guaranteed returns, and fees and commissions; again these were claims to which they were on notice of at the time of their investment or shortly thereafter. Plaintiffs do not claim to have made any efforts to investigate their claims at the time. Moreover if they had fulfilled their duty of inquiry required of reasonable investors to diligently investigate the nature of their in-

---

43. *See* RAM 86 Prospectus at 21 (stating that enactment of tax laws "could cause the value of real estate to decline" with the possible result of "reduc[ing] the amount of Additional Interest to be paid to the Partnership.").

44. *See* RAM 86 Prospectus at 60 (discussing various tax reform proposals and their possible retroactive effect).

45. *See e.g.* Supplement No. 2 at 2 (Apr. 9, 1986); Supplement No. 3 at 4–5 (July 25, 1986); Supplement No. 5 at 8 (Sept. 8, 1986); Supplement No. 6 at 9 (Oct. 29, 1986).

46. *See* RAM 86 Form 10–Q, at 2 (Mar. 31, 1987) ($4.39 per unit, 7% rate of return); RAM 86 Form 10–Q, at 2 (June 30, 1987) ($4.51 net income per unit, 7% rate of return); RAM 86 Form 10–Q at 2 (Sept. 30, 1987) ($4.38 net income per unit, 7% rate of return).

vestments, the RAM 86 Plaintiffs could have easily discovered the alleged fraudulent scheme of which they complain in both the original and amended complaint.[47] Thus, to permit the amendment of the Complaint to the extent it refers to RAM 86 Plaintiffs would be futile and is denied.

Accordingly, as the RAM 86 Plaintiffs were placed on notice of their RICO claims more than four years before filing their complaint, they are time barred.

The RAM 2 Plaintiffs' RICO claims are not barred by the statute of limitations and leave is hereby granted to amend the *RAM/Pate* Complaint in accordance with this decision.

## GLOBAL IV

### I. *Application of Global I: The Statutes of Limitations for the § 10(b) Claims*

■ In *Global I* this Court laid out the law of the case concerning the statutes of limitations for § 10(b) securities fraud claims. For § 10(b) claims filed on or after June 20, 1991, private actions must be commenced within one year after the discovery of the facts constituting the violation and within three years of the violation. *See Global I*, 815 F.Supp. at 632; *see also Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, —— & n. 9, 111 S.Ct. 2773, 2782 & n. 9, 115 L.Ed.2d 321 (1991). The Congressional Amendment[48] of the Securities and Exchange Act of 1934, Section 27A, is not unconstitutional. *Global I*, 815 F.Supp. at 632; *see also Axel Johnson Inc. v. Arthur Andersen & Co.*, 6 F.3d 78, 81–84 (2d Cir. as Am. Oct. 18, 1993) (holding 27A is not unconstitutional). For § 10(b) claims filed between November 8, 1990 and June 20, 1991, the statute of limitations will also be the uniform one-year/three-year period as adopted in *Ceres Partners v. GEL Assocs.*, 918 F.2d 349, 364 (2d Cir.1990) ("*Ceres*"). *Global I*, 815 F.Supp. at 632. All securities claims filed in the Southern District of New York before November 8, 1990 will be governed by the Second Circuit's prior practice of borrowing the most analogous state statute of limitations for the § ·10(b) claims. *Id.* at 633.

### A. *Inquiry Notice*

■ In *Global I*, this Court considered when Plaintiffs were placed on inquiry notice of their alleged securities fraud claims. *See Global I*, 815 F.Supp. at 637–41. The law of this case dictates that the statute of limitations for securities fraud begins to run when the plaintiff has actual knowledge of the alleged fraud or when the plaintiff is placed on *inquiry notice*, to wit, when the plaintiff has "knowledge of facts which in the exercise of reasonable diligence should have led to actual knowledge." *See Global I*, 815 F.Supp. at 637 (quoting *Phillips v. Levie*, 593 F.2d 459, 462 (2d Cir.1979) (citations omitted). The statute is not tolled for plaintiffs' "leisurely discovery," *Klein v. Bower*, 421 F.2d 338, 343 (2d Cir.1970), but runs from the moment plaintiffs' "should have discovered the general fraudulent scheme," *Robertson v. Seidman & Seidman*, 609 F.2d 583, 587 (2d Cir.1979) (quoting *Berry Petroleum Co. v. Adams & Peck*, 518 F.2d 402, 410 (2d Cir.1975)).

■ Information which triggers inquiry notice of the probability of an alleged securities fraud may be any "financial, legal or other data available to the plaintiffs providing them 'with sufficient storm warnings to alert a reasonable person to the [probability] that there were either misleading statements or significant omissions involved in the sale of the [securities].'" *Global I*, 815 F.Supp. at 639 (citations omitted).

■ Inquiry notice may be derived from: letters and other documents provided to limited partners by the partnership; offering materials; and public disclosures in the media about the financial condition of the defendant and other lawsuits alleging fraud committed by the defendant. *Id.* Finally, "nei-

---

**47.** Plaintiffs may not, by amending their Complaint, undo the inquiry notice and resulting obligations conceded by their first complaint. *See, e.g., Garman v. Griffin*, 666 F.2d 1156, 1158 (8th Cir.1981); *Wiseman v. Reposa*, 463 F.2d 226 (1st Cir.1972); *Giannone v. United States Steel Corp.*, 238 F.2d 544, 547 & n. 2 (3d Cir.1956).

**48.** The 1934 Act was amended in the Federal Deposit Insurance Corporation Improvement Act of 1991, Pub.L. No. 102–242, § 476, 105 Stat. 2236 (codified at Securities Exchange Act of 1934, § 27A, 15 U.S.C. § 78aa–1).

ther reassurances accompanying the relevant notice nor the continued failure to disclose the facts allegedly misrepresented in the first place relieves the plaintiff of his [or her] duty to undertake reasonable inquiry or tolls the statute of limitations." *Id.* at 640.

Applying these standards in *Global I,* this Court found that the *Southern Inns* Plaintiffs were placed on inquiry notice at the time they purchased their Partnership units and that "[f]urthermore, the information available to them at the time of purchase was such that it placed them on notice of the probability and not merely the possibility of virtually every aspect of the §§ 10(b) and 12(2) securities fraud claims." *Id.* at 652.

### B. *Statute of Limitations are Procedural, Not Substantive Claims*

■ In *Global I,* this Court noted that "[f]ederal courts have viewed questions pertaining to the statutes of limitations for federal securities claims as procedural, not substantive, matters, and they are, therefore, subject to the federal law of the transferee court." *Global I,* 815 F.Supp. at 636. Therefore, the § 10(b) statute of limitations cannot be considered when looking at § 10(b) as predicate acts for RICO allegations.

## II. *The Miami Towers Action*

### Background

On December 18, 1989, the Barron Plaintiffs[49] filed their Complaint in the Southern District of New York. On December 18, 1990, an order was entered consolidating the following cases: *Barron v. Miami Executive Towers Assocs. L.P.,* No. 89 Civ. 8369, *Cho v. Miami Executive Towers Assocs. L.P.,* 90 Civ. 0156 and *Donhowe v. Miami Executive Towers Assocs. L.P.,* 90 Civ. 6256 under 89 Civ. 8369. On April 6, 1992, the Miami, Dreyer & Traub, Anchor National Life Insurance, Appraisal Group International and Steinberg Defendants filed their respective

Motions to Dismiss the Barron Plaintiffs November 20, 1990 Complaint.

On June 8, 1992, this Court entered an Opinion denying in part Defendant Appraisal Group International's Motion to dismiss the *Miami Towers* Plaintiffs' Consolidated Amended and Supplemental Complaint and granting Defendant Steinberg's motion to dismiss the Complaint as against him. *Barron v. Miami Executive Towers Assocs. Ltd. Partnership,* 142 F.R.D. 394 (S.D.N.Y.1992). On October 11, 1991, the Plaintiffs filed their proposed "First" Consolidated Amended and Supplemental Complaint (The "1991 Complaint").[50] During the next year, numerous briefs in opposition, affidavits and exhibits from all parties have ensued, and the Motions were deemed fully submitted as of July 30, 1993.

The *Miami Towers* Plaintiffs' motion requesting this transferee court to "suggest" a remand of the *Miami* action back to Judge Sprizzo on April 14, 1993 is denied for the reasons stated in *Global I. See Global I,* 815 F.Supp. at 635 (explaining the rationale behind the consolidation of multidistrict litigation). Similarly, the *Clovine/Ellingson* Plaintiffs' April 14, 1993 motion for a suggestion of remand to Judge Rubin in the Southern District of Ohio is also denied.

The Miami Plaintiffs invested in the Miami Executive Towers Associates Limited Partnership pursuant to their offering of May, 1985. 1991 Compl. ¶¶ 5, 25. Forty-seven units, at $120,003 per unit, were offered for a total offering of $5,640,150. The limited partnership was formed for the purpose of owning two neighboring office buildings located in Miami, Florida, Airport Executive Towers I and II, and leasing the underlying land. The stated objectives of the partnership were:

... (1) to protect the capital invested by the Partnership; (2) to derive capital gains through potential appreciation in the value of the Project; (3) to provide cash distribu-

---

**49.** The "Barron Plaintiffs" means all the original Plaintiffs on the Consolidated Complaint with the exception of the later added Bleistine Plaintiffs. The "Miami Plaintiffs" means both the Barron and the Bleistine Plaintiffs.

**50.** Defendants allege that the Miami Plaintiffs have amended their Complaint on as many as eight separate occasions. *See e.g.* Miami Def.'s Reply Mem. at 42.

tions from the operation of the Project; and (4) to provide current tax benefits. 1991 Compl. ¶ 24.

Plaintiffs allegedly relied on the PPM and other unidentified offering materials in deciding to purchase interests in the Miami Limited Partnership. 1991 Compl. ¶¶ 5, 93. The 1991 Complaint alleges that due to "competitive pressures," the Miami property was lost in foreclosure in December 1989. 1991 Compl. ¶ 92. The Miami Plaintiffs' securities fraud claims against the collective Defendants for allegedly violating federal securities and racketeering laws are based upon purported untrue statements contained in, and alleged material omissions omitted from, the Miami PPM. 1991 Compl. ¶ 93.

### A. The Majority of Miami Towers's § 10(b) Claims are Barred by the Statute of Limitations

As mentioned above, in *Global I* this Court held that all securities claims filed in the Southern District of New York before November 8, 1990, will be governed by the Second Circuit's prior practice of borrowing the most analogous state statute of limitations for the § 10(b) claims. *Global I*, 815 F.Supp. at 633; *see also Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). The *Miami Towers* Complaint was filed on December 18, 1989, and accordingly, is governed by this rule.

There are two exceptions to this rule, however, in the case of the later added Defendants, Dreyer & Traub, and the later added Plaintiffs, Philip A. and Patricia D. Bleistine ("Bleistine Plaintiffs"). Judge Sprizzo granted leave to the Barron Plaintiffs to add Defendants Dreyer & Traub to their action on December 18, 1990, a month after the Second Circuit decision in *Ceres*. Dreyer & Traub were served, and thus first had notice of the pendency of these actions on December 27, 1990. The claims against Dreyer & Traub are accordingly governed by the statute of limitations described by *Ceres*. *See Global I*, 815 F.Supp. at 632. As this is more than one year from the date the Barron Plaintiffs admit to having notice of the alleged "fraud" (September 8, 1989) and more than three years from Plaintiffs' investments in May

and June 1985, the § 10(b) claims against Dreyer & Traub are time-barred under the one-year/three-year period laid out in *Ceres*. Accordingly, Dreyer & Traub's motion to dismiss the securities fraud claims against them is granted.

Similarly, the later added Bleistine Plaintiffs' security fraud claims are time-barred under *Ceres*. The Bleistine Plaintiffs admit to purchasing their securities between May and June, 1985. The Plaintiffs were not added until the November 20, 1990 Complaint, which was not filed until December 21, 1990, more than a month after the Second Circuit's decision in *Ceres*. The Bleistine Plaintiffs claims are, accordingly, bound by one-year/three-year statute of limitations for § 10(b) securities fraud. Accordingly, the Bleistine Plaintiffs' § 10(b) claims are dismissed.

The remaining Plaintiffs, the Barron Plaintiffs, purchased their interests between in May 24 and June 14, 1985. *Barron* Surreply Memo; *Global I & II*, 815 F.Supp. at 629. Their Complaint was filed on December 18, 1989, and accordingly the applicable statute of limitations would be either the forum state's most analogous state law claim statute of limitations or the most analogous state law claim under New York's "borrowing statute," whichever is shorter. *See Global I*, 815 F.Supp. at 649; *Armstrong v. McAlpin*, 699 F.2d 79, 87 (2d Cir.1983); *Arneil v. Ramsey*, 550 F.2d 774, 779–80 (2d Cir.1977).

The Barron Plaintiffs live in Alabama, California, Colorado, Florida, Georgia, Iowa, Kansas, Massachusetts, Nevada, Ohio, Pennsylvania, Utah, and Vermont. 1991 Compl. Schedule A. It is necessary to identify the statute of limitations which would be applied by district courts sitting in these states in order to determine the timeliness of their § 10(b) claims. The Miami Plaintiffs submitted a Statute of Limitations Survey to this Court on August 28, 1992. Reviewing this survey, it is evident that 21 of the remaining 23 Barron Plaintiffs are barred by their respective state statute of limitations from pursuing their § 10(b) claims.

### 1. Plaintiffs Were Placed on Inquiry Notice No Later Than 1986

The Barron Plaintiffs made their investments in May through June of 1985, more

than four and a half years prior to the filing of their Complaint. Plaintiffs were placed on inquiry notice of their claims by various statements in the Miami PPM and correspondence of September 26, 1986 (the "1986 letter"), distributed more than three years before they filed their Complaint. The 1986 letter set forth the details of the declining occupancy rates, from 96% in 1985 to 85% in September 1986. Herman Aff. Ex. B. at 1. The 1986 letter also disclosed that there was a change in management at the Miami Airport Executive Towers I and II and that expenses were accruing for tenant improvements, leasing commissions, and other building expenses. The net result, according to the 1986 letter, was that "expenses have significantly exceeded cash flow after debt service" and that "Integrated Resources, Inc. has advanced funds to the Partnership to cover such costs." Herman Aff. Ex. B. at 1.

In *Global I*, this Court noted that letters and other documents provided to limited partners constituted information which "triggers" inquiry notice. *Global I*, 815 F.Supp. at 639. In this case, the 1986 letter, the availability of the appraisal to prospective limited partners, and the wording of the PPM constitutes sufficient "storm warnings" that the Plaintiffs were placed on inquiry notice. As noted in *Global I*, "once placed on inquiry notice, a limited partner cannot avoid the duty to inquire by relying on reassurances and optimistic statements made by the partnership." *Id.* at 640.

**2. *Section 10(b) Claims that are Time–Barred Under Statutes of Limitations Triggered by the Purchase of a Security***

**a. *Eleventh Circuit/Fifth Circuit:*[51] *Alabama***

 Walter H. Till's federal securities claims are time-barred. A district court sit-

ting in the Eleventh Circuit and deciding the timeliness of a § 10(b) claim governed by pre-*Ceres* law would apply that state's blue sky law and hold that a plaintiff had two years from the contract date of the purchase of the security to bring an action for § 10(b) violations. *See White v. Sanders*, 650 F.2d 627, 629 (Former 5th Cir.1981) (applying Alabama blue sky law, Ala.Code § 8–6–19(e)); *see also Smith v. Duff & Phelps, Inc.*, 891 F.2d 1567, 1571 (holding the "applicable limitations period is two years" and "doctrine of fraudulent concealment does not apply"), *reh'g denied*, 904 F.2d 712 (11th Cir.1990); *Durham v. Business Management Assocs.*, 847 F.2d 1505, 1508 (11th Cir.1988).

Till, a resident of Alabama, purchased his investment unit in the Miami Partnership between May and June, 1985 but did not file suit until December 18, 1989. Thus, Till's § 10(b) claim is time-barred under the applicable Alabama law. *See Global I*, 815 F.Supp. at 652–53.

**3. *Claims that are Time–Barred Under Statutes of Limitations Triggered by Inquiry Notice.***

The timeliness of the remaining § 10(b) claims brought by the Barron Plaintiffs are governed by the applicable state statute of limitations triggered by a plaintiff's placement on inquiry notice of the fraud subsequently alleged in his or her complaint against a defendant.

**a. *First Circuit: Massachusetts***

 A district court sitting in the First Circuit on or before June 19, 1991 would have applied the forum state's most analogous statute of limitations. The First Circuit has held that the three year period set by Mass.Gen.Laws ch. 260 § 2A applies to securities fraud actions.[52] *See Maggio v. Gerard*

---

51. Effective October 1, 1981, the circuits were reorganized so that a circuit judge sitting in Alabama was moved from the Fifth to the Eleventh Circuit. *See* 28 U.S.C. § 41, Pub.L. No. 96–452, § 5(2).

52. For claims arising prior to January 1, 1974, the prescribed limitations period is two years;

for cases arising on or after January 1, 1974 the limitations period is three years. *See Maggio v. Gerard Freezer & Ice Co.*, 824 F.2d 123, 124 n. 2 (1st Cir.1987); *Cook v. Avien, Inc.*, 573 F.2d 685, 694–95 (1st Cir.1978). Some of the district courts in Massachusetts, however, have followed the holding of *Abelson v. Strong*, 644 F.Supp.

*Freezer & Ice Co.*, 824 F.2d 123, 128 (1st Cir.1987) (holding that ch. 260 § 2A's three year statute of limitations period applies; emphasizing that a plaintiff is barred if "sufficient facts were available to put a reasonable investor in plaintiff's position on inquiry notice of the *possibility* of fraud" and if plaintiff exercised "due diligence."); *General Builders Supply Co. v. River Hill Coal Venture*, 796 F.2d 8, 11–14 (1st Cir.1986) (holding ch 260 § 2A's three year statute of limitations applies and that plaintiffs had sufficient knowledge that would alert a reasonable investor to the possibility of fraud.).

Frank S. Walker, III, a resident of Massachusetts purchased his investment unit between May and June, 1985, and was placed on inquiry notice no later than September, 1986, of the § 10(b) allegations on which he is basing this present action. The original Complaint in this action was filed on December 18, 1989. Thus, Walker's § 10(b) claim is time-barred under Massachusetts law.

### b. *Second Circuit: Vermont*

■ Barring retroactive application of *Ceres*, a district court sitting in the Second Circuit on or before June 19, 1991 would have applied the forum state's most analogous statute of limitations. The statute of limitations for § 10(b) claims accruing in Vermont prior to *Ceres* was the state's common law fraud provisions which are governed by Vermont's general civil statute of limitations, 12 V.S.A. § 511, of six years. *See Ceres*, 918 F.2d at 354 (citing *Bartels v. Algonquin Properties Ltd.*, 471 F.Supp. 1132, 1147–49, at 1148 (D.Vt.1979) (holding that although the Vermont Securities Act, 9 V.S.A. §§ 4201–4241 provides a period of limitations of two years, the Second Circuit has "consistently adopted state statutes of limitations for actions based upon common law fraud.")

Jon–Michael Tucci, a resident of Vermont, purchased his investment between May and June, 1985. Therefore, his § 10(b) claim is timely.

### c. *Third Circuit: Pennsylvania*

On June 19, 1991, a district court sitting in the Third Circuit would have applied the statute of limitations set forth in *In re Data Access Sys. Sec. Litig.*, 843 F.2d 1537 (3d Cir.) (en banc), *cert. denied*, 488 U.S. 849, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988) (*"Data Access"*); *see also Global I*, 815 F.Supp. at 653. In *Data Access*, the court adopted a uniform statute of limitations for § 10(b) claims of "one year after the plaintiff discovers the facts constituting the violations, and in no event more than three years after such a violation." *Data Access* at 1550. This period is shorter than New York's two-year/six-year period, and is therefore applicable to the claims of the Pennsylvania plaintiffs. *See Global I*, 815 F.Supp. at 654.

Quirico Magbojos, M.D., and Zenaida Magbojos, M.D., and Thomas Zaccaria, D.D.S., all Pennsylvania residents, purchased their investment units between May and June, 1985, and their § 10(b) claims are time-barred under Pennsylvania law.

### d. *Sixth Circuit: Ohio*

■ A federal district court sitting in the Sixth Circuit would have applied the statute of limitations governing securities law in accordance with Ohio's statute relating to common law fraud. *See Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 744 (6th Cir.1992) (upholding district court's dismissal based on four year limitations as alleged securities fraud claim barred occurred more than four and one-half years before and holding that "a bare assertion of delayed discovery [ ] insufficient to prevent the statute of limitations from running.") (citations omitted); [53] *Silverberg v. Thomson McKinnon*

---

524, 530–33 (D.Mass.1986) holding that the more analogous statute of limitations for § 10(b) claims accruing in Massachusetts is governed by § 410 of the Massachusetts Uniform Securities Act, Massachusetts General Law ("MGL"), c. 260, § 2A, which provides for a two year statute of limitations. *See also Slavin v. Morgan Stanley & Co.*, 791 F.Supp. 327, 331–32 (D.Mass.1992); *Alton v. Prudential–Bache Sec., Inc.*, 753 F.Supp. 39, 41 (D.Mass.1990); *In re Atlantic Fin. Man-*

*agement, Inc. Sec. Litig.*, 718 F.Supp. 1003, 1009–10 (D.Mass.1988).

**53.** The Court noted that plaintiff must meet three elements to establish fraudulent concealment as basis of tolling statute: (1) Defendants wrongfully concealed their actions; (2) Plaintiff failed to discover operative facts within limitations period; and (3) Plaintiff's due diligence in attempting to discover facts. *Hoover*, 958 F.2d at 744 n.

*Sec., Inc.*, 787 F.2d 1079, 1082 (6th Cir.1986) (holding Ohio four-year limitations period, Ohio Rev. code Ann. § 2305.09(C) (Page 1981), governs § 10(b) actions).

Plaintiff Son Koo Cho, a resident of Ohio, purchased his investment unit in the Miami Towers Partnership between May and June, 1985. Thus, his § 10(b) claims are time-barred by the application of the four year Ohio statute of limitations to those claims.

### e. Eighth Circuit: Iowa

■■■ A district court sitting in the Eighth Circuit faced with the prospect of borrowing a state statute of limitations for federal purposes in a pre-*Ceres* case would apply the statute that "best effectuates the federal policy at issue." *Vanderboom v. Sexton*, 422 F.2d 1233, 1237 (8th Cir.), *cert. denied*, 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970). A district court sitting in Iowa deciding a pre-*Ceres* action for a § 10(b) claim would apply the two-year statute of limitations period set forth in Iowa's blue sky statute, Iowa Code § 502.26, rather than the five-year limitations period applicable to common law fraud actions brought in that state. *See In re Alodex Corp. Sec. Litig.*, 533 F.2d 372, 374 (8th Cir.1976).

Plaintiffs Mark G. Donhowe and Vicki L. Donhowe, residents of Iowa, purchased their interests in Miami Towers between May and June, 1985. Under the applicable blue sky provision, the Donhowes had two years from discovery of the alleged fraud to bring this action. Thus, the Donhowes' § 10(b) claims are time-barred under the applicable Iowa law.

### f. Ninth Circuit

A district court sitting in the Ninth Circuit prior to *Ceres*, would apply the "forum state's statute of limitation for general fraud claims." *Reeves v. Teuscher*, 881 F.2d 1495, 1500 (9th Cir.1989); *accord Gray v. First Winthrop Corp.*, 989 F.2d 1564, 1566 (9th Cir.1993); *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1411–12 (9th Cir.1987); *Davis v. Birr, Wilson & Co.*, 839 F.2d 1369, 1370 (9th Cir.1988).

1 (citing *Dayco Corp. v. Goodyear Tire & Rubber*

### 1. California

■■■ A district court sitting in California would apply California's three year statute of limitations for fraud actions, Cal.Civ.Pro. Code § 338 (West Supp.1990). *See Stitt v. Williams*, 919 F.2d 516 (9th Cir.1990) (holding the three year statute of limitations on plaintiff's securities fraud claims based on the formation of the limited partnership interests began to run when they received copies of the texts of the partnership agreements); *Davis v. Birr, Wilson & Co.*, 839 F.2d 1369, 1370 (9th Cir.1988) (applying California's three year statute of limitations and holding that plaintiff may not toll the limitations because he should have discovered the fraud with "reasonable diligence" which is "tested by an objective standard").

Lucie Barron, the Barron Family Trust, Gerald R. Niznick, D.M.D., and George H. Rubens, M.D., all residents of California, purchased their respective Miami investment units between May and June, 1985, more than three years prior to filing this action. As a result, their securities claims are time barred under California law.

### 2. Nevada

■■■ A federal district court sitting in Nevada prior to June 19, 1991, would follow the Ninth Circuit's "practice of borrowing state fraud limitations periods" for security fraud actions. *See Davis v. Birr, Wilson & Co.*, 839 F.2d 1369, 1373 (9th Cir.1988) (Aldisert, concurring) (listing Nev.Rev.Stat. § 11.190.-3(d) (1985) as an example of the diversity of state fraud statutes limitations period within the Ninth Circuit; arguing for one-year/three-year rule).

In the case at bar, not only the Barron Plaintiffs, but the Miami and Appraisal Defendants all seem to agree upon the statute of limitations period as set forth in the Nevada Uniform Securities Act, Nev.Rev.Stat. § 90.670, (*effective*, January 1, 1988). *See* Mushkin "Statute of Limitations Survey" at 2, Appraisal Def. Mem. of Law at 40; Herman Let. July 21, 1993, Ex. 2. Section 90.-670 states:

*Co.*, 523 F.2d 389, 394 (6th Cir.1975)).

A person may not sue under NRS 90.660 [the Securities Act civil liability provision] unless suit is brought within the earliest of 1 year after the discovery of the violation, 1 year after discovery should have been made by the exercise of reasonable care, or 3 years after the act, omission or transaction constituting the violation.

Therefore, an action to recover on a § 10(b) claim is time-barred if it is brought more than three years after the purchase of the security or more than one year after he was placed on "reasonable" inquiry notice.

Charles E. Huff, a resident of Nevada, purchased his Miami investment unit between May and June, 1985, more than three years before this action was filed. Accordingly, his alleged § 10(b) claims are time-barred by the application of Nev.Rev.Stat. § 90.670 to his claims.

### g. Tenth Circuit

A district court sitting in the Tenth Circuit faced with the prospect of borrowing a state statute of limitations for federal purposes in a pre-*Ceres* case would follow the "most analogous state law limitations period." *Bath v. Bushkin, Gaims, Gaines & Jonas*, 913 F.2d 817, 819 (10th Cir.1990) (rejecting district court's application of *Data Access*); *Hackbart v. Holmes*, 675 F.2d 1114, 1120–21 (10th Cir.1982) (applying Colorado's statute of limitations for fraud); *accord Anixter v. Home-Stake Prod. Co.*, 939 F.2d 1420, 1441 (10th Cir.1991) (noting pre-*Lampf* practice in Tenth Circuit was to borrow state fraud limitation statutes), *cert. denied*, ── U.S. ──, 113 S.Ct. 1841, 123 L.Ed.2d 467 (1993).

### 1. Colorado

 district court sitting in Colorado deciding a pre-*Ceres* § 10(b) claim would apply the three-year statute of limitations period set forth in Colorado's fraud statutes, Col.Rev.Stat. §§ 13–80–108 to –109. *Hackbart v. Holmes*, 675 F.2d 1114, 1120 (10th Cir.1982) (noting statute is triggered when "aggrieved party … should have discovered [the fraud] by the exercise of reasonable diligence."); *accord Ebrahimi v. E.F. Hutton & Co.*, 852 F.2d 516 (10th Cir.1988) (applying Colorado's three year limitations period for general fraud, § 13–80–101(1)(c) (1987) to a

commodities fraud claim; holding objective, not subjective standard for inquiry notice meant that even mental incapacity does not bar statute's tolling).

Mr. John E. Knudsen, a resident of Colorado, purchased an interest in Miami Towers between May and June, 1985. Under Colorado's statute of limitations for general fraud, Knudsen had three years to bring his § 10(b) claim, and consequently, he is time-barred here.

### 2. Kansas

 Pre-*Ceres* actions for § 10(b) violations heard by district courts sitting in Kansas are governed by the two-year statute of limitations set forth in Kansas State Acts ("KSA") 60–513(a)(3), which provides a two year statute of limitations for actions sounding in fraud. *See Conrardy v. Ribadeneira*, No. 86–1745–C, 1990 WL 66603, at *8, **4–9, 1990 U.S.Dist. LEXIS 6036, at *26, **16–29 (D.Kan. Apr. 19, 1990) (applying KSA 60–513(a)(3) to bar 10(b) claim to find that "[o]nce the plaintiff is imputed with knowledge of what is and is not contained in the offering document … it is clear that the plaintiff could have reasonably discovered upon the exercise of reasonable diligence the alleged fraud over two years before he filed his suit.").

Joseph B. Mackey, a resident of Kansas, purchased his investment interest in Miami Towers between May and June, 1985 and was placed upon inquiry notice of the alleged fraud no later than September, 1986. Thus, his § 10(b) claims are time-barred under Kansas law.

### 3. Utah

 Under Utah law, the statute of limitations for securities fraud is three years from the date of discovery. *See Marchese v. Nelson*, 700 F.Supp. 522, 523 (D.Utah 1988) (applying Utah common law fraud statute, Utah Code Annotated, § 78–12–26(3)). William Lyle Ellingson, M.D., is a resident of Utah and purchased his interest in Miami Towers between May and June, 1985. Mr. Ellingson was on inquiry notice of the alleged fraud no later than September, 1986 and

therefore his § 10(b) claims are time-barred under Utah law.

### h. *Eleventh Circuit*

A district court sitting in the Eleventh Circuit faced with the prospect of borrowing a state statute of limitation for federal purposes in a pre-*Ceres* case would apply the statute that "is the period of limitations prescribed by the closest analogous state statute." *See Smith v. Duff & Phelps, Inc.*, 891 F.2d 1567, 1570 (11th Cir.1990) (approving of *Data Access* but refusing to adopt the Third Circuit approach, which would mean overruling a decision by a previous panel without an *en banc* hearing).

### 1. *Florida*

■■■ A district court sitting in Florida would apply the state's two-year statute of limitations applicable to actions under Florida Statutes § 517.301(1)(a)(2) (1991). *See Knight v. E.F. Hutton & Co.*, 750 F.Supp. 1109, 1112 (M.D.Fla.1990); *Byrne v. Gulfstream First Bank &·Trust Co.*, 528 F.Supp. 692, 694 (S.D.Fla.1981) (applying Florida's blue sky law, Fla.Stat. § 95.11(4)(e)), *aff'd*, 720 F.2d 686 (11th Cir.1983). The running of this statute of limitations is tolled until the alleged fraud is discovered or reasonably should have been discovered in the exercise of reasonable diligence. *See Osterneck v. E.T. Barwick Indus., Inc.*, 825 F.2d 1521, 1532, 1535 (11th Cir.1987), *aff'd*, 489 U.S. 169, 109 S.Ct. 987, 103 L.Ed.2d 146 (1989); *Knight*, 750 F.Supp. at 1112. District courts sitting in Florida have specifically determined that whether due diligence would have led to discovery more than two years before suit was filed is a jury question. *Id.* at 1112.

The § 10(b) claims of the Barron Plaintiffs who were Florida residents at the time they purchased their interests in the Partnership survive the Moving Defendants' motion to dismiss, under Global I, because the question of whether due diligence would have led to the discovery of the fraud they now allege more than two years before they filed this action is a question for the jury to decide. Therefore, the § 10(b) claims of Plaintiffs Dennis M. Boyle, Harold Ginsberg, and James M. McLaughlin (the "Florida Plaintiffs") are not time-barred under Florida law.

### 2. *Georgia*

■■■ A district court sitting in Georgia deciding a pre-*Ceres* action for a § 10(b) claim would apply the two year statute of limitations period set forth in Georgia's blue sky law, Georgia Securities Act, O.C.G.A. § 10-5-14(d) (1982). *See* O.C.G.A. § 10-5-14(d) ("no person may sue under this Code section more than two years from the date of the contract for sale or sale"); *see also Friedlander v. Troutman, Sanders, Lockerman & Ashmore*, 788 F.2d 1500, 1507-08 (11th Cir.1986). Three plaintiffs, Thomas J. Hill, Philip A. Bleistine and Patricia D. Bleistine, are residents of Georgia. Earlier, this Court found that the Bleistines' Complaint was not filed until December 21, 1990, more than a month after the Second Circuit's decision in *Ceres*, and their claims are, accordingly, time-barred. Hill's § 10(b) claims are time-barred under the two year statute of limitations set forth in the Georgia blue sky law.

Therefore, the moving Defendants' Global Motion IV, in so far as it applies Global Motion I to the Miami action, is granted as to the Plaintiffs § 10(b) claims with the exception of Florida Plaintiffs Dennis M. Boyle, Harold Ginsberg, and James M. McLaughlin and Vermont Plaintiff John-Michael Tucci, D.C..

## III. *Applying Global Motion II: § 10(b) Claims of The Remaining Barron Plaintiffs*

### A. *Legal Standards Necessary to Sustain a § 10(b) Fraud Claim*

#### 1. *Rule 9(b) Specificity Requirement.*

In order to state a claim under § 10(b) of the Exchange Act, plaintiffs must allege: (1) material misstatements or omissions; (2) indicating an intent to deceive or defraud; (3) in connection with the purchase or sale of a security; (4) upon which the plaintiffs reasonably and detrimentally relied. *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir.1986).

■■■ In *Global II*, this Court stated that Federal Rules of Civil Procedure Rule 9(b)

requires "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." *Global II,* 815 F.Supp. at 666. The particularity requirement of Rule 9(b) serves to provide a defendant with fair notice of a plaintiff's claim, to protect a defendant's professional reputation, and to reduce the number of suits. *Di Vittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987); *Stern v. Leucadia Nat'l Corp.,* 844 F.2d 997, 1003 (2d Cir.), *cert. denied,* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 109 (1988).

The requirements of Rule 9(b) should be applied stringently, especially "where allegations of securities fraud are involved." *Ruff v. Genesis Holding Corp.,* 728 F.Supp. 225, 227 (S.D.N.Y.1990). The strict application of Rule 9(b) in securities fraud litigation "reduces the possibility that conclusory complaints will enable a plaintiff to engage in lengthy and costly discovery, 'with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the process will reveal relevant evidence....' " *Lou v. Belzberg,* 728 F.Supp. 1010, 1022 (S.D.N.Y. 1990) (quoting *Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978)).

■ The Rule 9(b) pleading requirements (which dictate that plaintiffs must specify the time, place, and manner of making the fraudulent statement) are "somewhat relaxed where ... plaintiff[s] base [their] complaint on an Offering Memorandum." *Stevens v. Equidyne Extractive Indus. 1980,* 694 F.Supp. 1057, 1061 (S.D.N.Y.1988). "Reference to the Offering Memorandum satisfies 9(b)'s requirements as to identification of the time, place and content of the alleged misrepresentations." *Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986), although "allegations grounded in the offering memorandum be

based on specific facts allegedly misrepresented in that memorandum." *Tobias v. First City Nat'l Bank & Trust Co.,* 709 F.Supp. 1266, 1277 (S.D.N.Y.1989) (construing *Luce,* 802 F.2d at 55). This applies to private offering materials the general rule for fraud: That any Plaintiffs must specify " 'precisely what statements were made in what documents or oral misrepresentations.' " *Tobias,* 709 F.Supp. at 1277 (quoting *Todd v. Oppenheimer & Co.,* 78 F.R.D. 415, 420–21 (S.D.N.Y.1978)).

Therefore, the offering materials used to sell the partnership interests to the *Miami Towers* Plaintiffs will be considered by this Court as they are still "integral to [P]laintiffs' claim[s] and thus may be considered by the Court on a motion to dismiss." *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991); *I. Meyer Pincus & Assocs. P.C. v. Oppenheimer & Co.,* 936 F.2d 759, 762 (2d Cir.1991); *Ruff,* 728 F.Supp. at 226.

■ To allege fraud in overvaluing the assets listed in financial statements, the Plaintiffs must allege at least the accounting method which governs the way in which the assets are carried, or which "calls for a write-down to market value at a particular time." *Quantum Overseas N.V. v. Touche Ross & Co.,* 663 F.Supp. 658, 667 (S.D.N.Y.1987). The Plaintiffs must allege "what accounting practices should have been used," *Posner v. Coopers & Lybrand,* 92 F.R.D. 765, 768 (S.D.N.Y.1981), *aff'd,* 697 F.2d 296 (2d Cir. 1982), how these practices were not followed, and what practices should have been used in their place.[54]

■ Statements concerning a Partnership's alleged plans to launch an "aggressive acquisition strategy" are not actionable. *See Global II,* 815 F.Supp. at 672. Such statements cannot be actionable as a guaranty of future profitability as they only place a po-

---

54. In *Posner,* the plaintiff claimed that an accounting method, the "percentage of completion" method to report sales, was improper because the defendants knew of the non-viability of the project and therefore of their own inability to complete orders. The court held that, since it was "not dealing with a concrete fact, but rather with a conclusion: 'that the process ... was not economically viable,' " the accounting method

chosen was valid unless the plaintiff could show some fact indicating that it was impossible at that time to complete the sales orders. "Not everyone reaches a conclusion at the same time, and liability to purchasers of stock would arise only after the conclusion was reached and additional material misstatements were made." *Posner,* 92 F.R.D. at 769.

tential investor on notice that the partnership is a high-risk enterprise; an aggressive acquisition strategy guarantees immediate inroads into investment capital.

 Finally, when the facts are fully revealed in the offering memorandum no action will lie. *Bucher v. Shumway,* [1979–80 Transfer Binder] 1979 WL 1254, Fed.Sec. L.Rep. (CCH) ¶ 97,142 (S.D.N.Y.1979). If the current finances of the business at the time are fully revealed; therefore the motive, as such, is irrelevant. *Lavin v. Data Sys. Analysts, Inc.,* 443 F.Supp. 104 (E.D.Pa. 1977), *aff'd,* 578 F.2d 1374 (3d Cir.1978).

### 2. *Bespeaks Caution Doctrine.*

While caveats about projections do not insulate a Defendant from fraud, the warnings in a PPM can show that future presentations are merely projections, not statements of fact upon which the Plaintiffs can rely. *See Global II,* 815 F.Supp. at 672. Future misrepresentations may be misleading despite warnings only if based on present fraudulent numbers or present fraudulent facts or omissions. *See Luce v. Edelstein,* 802 F.2d 49, 56 (2d Cir.1986). A projection of future prospects which "bespeaks caution" is not actionable. *See Haggerty v. Comstock Gold Co.,* 765 F.Supp. 111, 114 (S.D.N.Y.1991); *CL–Alexanders Laing & Cruickshank v. Goldfeld,* 739 F.Supp. 158, 162 (S.D.N.Y.1990); *see also In re Donald J. Trump Casino Sec. Litig.,* 7 F.3d 357 (3d Cir.1993) ("*In re Trump*").

In *In re Trump,* the Third Circuit recently held that the alleged misrepresented and omitted facts in the context of · the entire PPM were not material as a matter of law. *Id.* at 369–70. The Third Circuit further determined that if a PPM explains the nature of the transaction in detail, with specific risk disclosures and cautionary language tailored to the investment, alleged omissions or misrepresentations relating to such risks are immaterial as a matter of law. *Id.* at 371.

 As noted in *Global II,* projections, in the context of a securities offering, are promises; and promises are actionable only if the defendant knows they are false when he makes them. *See Global II,* 815 F.Supp. at 674. *See also Luce,* 802 F.2d at 56. A promise of future income will be false when made if it is based on current facts which are falsely misrepresented in order to support the projections. *See Virginia Bankshares, Inc. v. Sandberg,* 501 U.S. 1083, ——, 111 S.Ct. 2749, ——, 115 L.Ed.2d 929, 948 (1991). Thus, some aspect of the projection must be actually false, and known to be false to the defendant making the promise at the time it was made, for the projection to be fraudulent.

 The projections in *Luce* which were held not to be fraudulent were hedged with cautionary language, which made it clear that projections were "necessarily speculative in nature," and the court stated that "[w]e are not inclined to impose liability on the basis of statements that 'bespeak caution.'" *Luce,* 802 F.2d at 56. The rationale is that if projections can be misleading if they are portrayed as certainties, they cannot be misleading if all the risks and uncertainties accompanying the investment are fully revealed. The result is the "bespeak caution" approach to federal securities fraud claims:

> The essence of the doctrine is that where an offering statement, such as a prospectus, accompanies statements of its future forecasts, projections and expectations with adequate cautionary language, those statements are not actionable as securities fraud. Within the past thirteen months, five circuit courts have adopted this approach to evaluating the actionability of a federal securities fraud claim based on future projections contained in a prospectus or other offering statement.

*In re Donald J. Trump Casino Sec. Litig.,* 793 F.Supp. 543, 549 (D.N.J.1992) (citations omitted), *aff'd,* 7 F.3d 357 (3d Cir.1993). "[C]ourts in this Circuit have repeatedly held that, with respect to future projections, there is no liability under § 10(b) for statements in an offering memorandum that 'bespeaks caution.'" *Haggerty,* 765 F.Supp. at 114; *see also In re Donald J. Trump Casino Sec. Litig.,* 793 F.Supp. at 549 ("District Courts in the Second Circuit have followed the *Luce* "bespeaks caution" approach consistently.").

### 3. *Causation.*

A securities fraud claim under § 10(b) claim requires both transaction causation and loss causation. "In other words, the plaintiff must show that the defendant's misrepresentations not only caused the plaintiff to engage in the transaction in question, but also that they caused the harm suffered." *Weiss v. Wittcoff,* 966 F.2d 109, 111 (2d Cir. 1992) (per curiam); *see also Wilson v. Ruffa & Hanover, P.C.,* 844 F.2d 81, 85 (2d Cir. 1988) (holding "loss causation" means that the "misrepresentation or omission caused the economic harm"), *aff'd on recons. sub nom., Wilson v. Saintine Exploration & Drilling Corp.,* 872 F.2d 1124 (2d Cir.1989). "To establish loss causation a plaintiff must show, that the economic harm it suffered occurred as a result of the alleged misrepresentations" and that the misrepresentation "induced it to enter into the transaction." *Citibank, N.A. v. K–H Corp.,* 968 F.2d 1489, 1495 (2d Cir.1992). Loss causation turns on the question of proximate cause.

The underlying rationale for the loss causation requirement is that "otherwise, the federal securities laws would establish an insurance program for every security purchased in reliance on a misstatement, even if the misstatement bears no relation to the reason for the decline in the security's value." *Carlton v. Franklin,* No. 89–2942, 1990 WL 116788, at *3–4, 1990 U.S.App. LEXIS 12946, at *10 (4th Cir. Aug. 2, 1990); *see also Huddleston v. Herman & MacLean,* 640 F.2d 534, 549 (5th Cir.1981) ("Absent the requirement of [loss] causation, Rule 10b–5 would become an insurance plan for the cost of every security purchased in reliance upon a material misstatement or omission."), *aff'd in part, rev'd on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

### B. *The Remaining Barron Plaintiffs § 10(b) Claims Fail*

The *Miami Towers* Complaint alleges that the *Miami Towers* Defendants "had access to the material facts regarding the Partnership which should have been stated in the Memorandum and either knew these facts or recklessly disregarded them." 1991 Compl.

¶ 15. Dreyer & Traub were retained by the *Miami Towers* Defendants "to advise them on compliance with the securities laws and to draft the Memorandum. 1991 Compl. ¶ 20. Anchor National Life is a life insurance company which "purchased all of the outstanding promissory notes issued by the plaintiffs to the Partnership in partial payment for their limited partnership interests." 1991 Compl. ¶ 21. Appraisal Group International "undertook to appraise the [Miami] property and make financial projections and cash flow analyses" and "delivered a 'Certificate of Appraisal' " stating that they had "not knowingly overlooked or failed to report any facts pertinent to this report." 1991 Compl. ¶¶ 28–30.

The Barron Plaintiffs allege that the Miami PPM omitted information from the Clark–Biondi Greater Miami Office Market Survey for the period July, 1983 through July, 1984 (the "Clark–Biondi report"). The alleged misrepresentations and omissions which all focus upon the description of the project and competition in the area include: [55]

#### 1. *Description of Location*

The memorandum failed to disclose the large scale development in the Airport West submarket, the reduction of rental rates in the Airport West submarket, or the continued expectation of stable asking rentals, all of which were allegedly disclosed in the Clark–Biondi report. 1991 Compl. ¶ 63.

#### 2. *Statistical Data*

The memorandum failed to provide statistics concerning the office space available, as disclosed in the Clark–Biondi report. 1991 Compl. ¶ 65.

#### 3. *Description of Competition*

The memorandum failed to present statistics comparing the Airport West submarket to the overall Miami office market, focusing only on the four largest markets and providing only percentages of space concentrated in those markets, as opposed to the raw square-footage in each market. 1991 Compl. ¶ 66.

---

55. Summary of the 1991 Complaint from Defendant Dreyer & Traub's Mem. of Law, at 7–9.

#### 4. Description of Occupancy

The memorandum failed to disclose that Airport West had the lowest increase in occupancy rates of all competing markets in 1983–1984. 1991 Compl. ¶ 68.

#### 5. Description of Rental Rates

The memorandum failed to disclose that newer Class A buildings in Airport West had lower effective asking rentals by virtue of rent concessions. 1991 Compl. ¶ 71.

#### 6. Description of Construction

The memorandum failed to portray the new construction in the market as high quality and thus failed to disclose the pressure that newer construction was placing on the existing market. 1991 Compl. ¶ 72.

#### 7. Description of Office Space Available/Description of Absorption

The memorandum failed to disclose the amount of office space available, thus making absorption figures misleading. 1991 Compl. ¶¶ 72–75.

#### 8. Description of Airport South

The memorandum described the Project as being in the Airport South submarket, not an identified submarket in the area, thus minimizing the scope of competition the Project would encounter. 1991 Compl. ¶¶ 78–81.

#### 9. Description of the Project

The memorandum failed to disclose that the two buildings were not part of an "office park" but rather were separated by an unrelated building and lot.

The memorandum also failed to accurately portray the physical condition of the buildings and the amount of available parking. 1991 Compl. ¶¶ 82–86.

The Complaint alleges that the *Miami Towers* Defendants (and the Dreyer & Traub Defendants) used the appraisal and the Clark–Biondi report in drafting the PPM, and excluded from the PPM negative information alleged contained in those materials. 1991 Compl. ¶ 59.

Notwithstanding the *Miami Towers* Plaintiffs' allegations, the PPM invited review of any relevant documentation used in its preparation. Miami PPM at 111–112. Further, even in the 1991 Complaint the Plaintiffs concede that the appraisal was readily available for their inspection at the time of invest-

ment, 1991 Compl. ¶ 32, and that the appraisal in turn relied upon and referred to the Clark–Biondi report. 1991 Compl. ¶ 33. As Plaintiffs did not exercise even minimal diligence at the time of investment, they cannot now state a fraud claim based upon material they could have reviewed. *Royal Am. Managers Inc. v. I.R.C. Holding Corp.*, 885 F.2d 1011, 1016 (2d Cir.1989) (dismissing § 10(b) claims because "each party had access to all relevant information and hence the opportunity to detect the "fraud.").

■■■ Further, the Plaintiffs' § 10(b) claims, subject to the motion to dismiss, are insufficiently plead to pass muster under Rule 9(b). Essentially, the Barron Plaintiffs state that the Defendants misrepresented and failed to adequately disclose the extent of competition in the Miami real estate market. But the Miami PPM contains at least five pages concerning the competition in the Miami market. Miami PPM at 45–49. In addition, the Miami PPM spends seven additional pages outlining the risk factors entailed in the limited partnership. Miami PPM at 29–35. Such risks include: expiration of 60.3% of the current occupants leases in 1986, *id.* at 29; the fact that Integrated would be making a $600,000 loan to the Partnership to pay for tenant improvements and leasing as an outside loan would not be available, and that even more funds may be necessary, *id.* at 29–30; that the project was highly leveraged, requiring substantial monthly obligations for debt service, *id.* at 30; that the Dade County's economy was dependent upon South American trade and that "[a]ny negative impact on the economy of Dade County could negatively affect occupancy rates" in the Project, *id.* at 31; and that extensive competition existed and more building that "are newer and more attractive" would soon be coming on line, *id.* at 31.

Such disclosures fall within the purview of the "bespeaks caution" doctrine. *Cf. In re Trump*, 7 F.3d at 371. Further, as noted in *Stevens*, "no liability attaches to an offering memorandum that purports to be speculative." *Stevens v. Equidyne Extractive Indus. 1980*, 694 F.Supp. at 1063. As this Court noted in *Global II*, "[t]o label a pro-

jection which does not pan out 'fraud' merely because it turned out not to be true is 'fraud by hindsight.'" *Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978). Here, the Plaintiffs identified facts which they contend were omitted from the projections but which were in fact adequately disclosed by the risks revealed in the Miami PPM.

### C. *The Barron Plaintiffs § 10(b) Claims Fail to Establish Loss Causation*

■ In addition, in order to sustain a § 10(b) securities fraud claim, the Plaintiffs must allege both transaction and loss causation. *Weiss v. Wittcoff,* 966 F.2d 109, 111 (2d Cir.1992). In order to plead transaction causation, Plaintiff must allege that misstatements or omission *caused* Plaintiffs to invest in the Partnership in the first place. To plead loss causation, Plaintiffs must allege that those misstatements or omissions are the reasons why Plaintiffs investments did not pan out. As such, Plaintiffs "must also allege that the specified misrepresentations and omissions 'proximately relate to the alleged reasons for the investors' losses." *Finkel v. Stratton Corp.,* 754 F.Supp. 318, 330 (S.D.N.Y.1990) (quoting *In re Gas Reclamation, Inc., Sec. Litig.,* 733 F.Supp. 713, 722 (S.D.N.Y.1990)), *aff'd in part and rev'd in part on other grounds,* 962 F.2d 169 (2d Cir.1992).

The Miami Complaint simply does not allege transaction causation or that "but for" the misrepresentations and omissions, Plaintiffs would not have invested in the Partnership. Similarly, the Barron Plaintiffs have not adequately alleged loss causation; that is the Plaintiffs have not plead why their investments lost value. *See Wilson v. Ruffa & Hanover, P.C.,* 844 F.2d 81, 86 (2d Cir.1988).

■ In a real estate securities case similar to the one at bar, the Honorable Charles S. Haight held that the plaintiffs' conclusory pleadings of loss causation was insufficient "given other plausible explanations for the investors' ultimate disappointment, such as changes in the tax laws and a downturn in the real estate market." *Finkel v. Stratton Corp.,* 754 F.Supp. 318, 330 (S.D.N.Y.1990). Similarly, the Barron Complaint does not

adequately allege why the Defendants alleged fraudulent acts necessarily resulted in their investment injuries. The Complaint merely states that due to "competitive pressures, as alleged, the downward economic course of the Project continued from 1985 until the Project was lost in foreclosure of the first mortgage in December, 1989." 1991 Compl. ¶ 92. However, this statement merely bolsters Defendants' argument that the Miami real estate market suffered substantial losses in value for a variety of reasons in the late 1980s, external circumstances that were beyond Defendants' control, but certainly warned about in the Miami Towers PPM.

Accordingly, the remaining Florida Plaintiffs' and Vermont Plaintiff's § 10(b) securities fraud claims are dismissed for failure to plead with particularity pursuant to Rule 9(b).

### IV. *The Miami Towers Plaintiffs Fail To State a Claim under RICO*

■ The *Miami Towers* Complaint asserts violations of 18 U.S.C. §§ 1962(a), (b) and (c), with violations of § 10(b) and mail fraud alleged as the requisite predicate acts. To state a cause of action under RICO, the Plaintiffs must allege:

(1) that the defendants (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate commerce.

*Moss v. Morgan Stanley Inc.,* 719 F.2d 5, 17 (2d Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984); *Zaro Licensing, Inc. v. Cinmar, Inc.,* 779 F.Supp. 276 (S.D.N.Y.1991). The failure of any one element is fatal to a RICO claim.

### A. *The Miami Plaintiffs Fail to Plead Predicate Acts*

■ The *Miami Towers* Plaintiffs plead securities fraud in violation of § 10(b) of the 1934 Act and violations of the mail fraud statute, 18 U.S.C. § 1341 as predicate acts for their RICO claims. 1991 Compl. ¶ 124.

As set forth above, the *Miami Towers* Plaintiffs have failed to adequately allege material misrepresentations or omissions in the PPM, transaction or loss causation, and the particulars of fraud required under Fed.R.Civ.Pro. 9(b), necessary to sustain a § 10(b) securities fraud claim.[56]

■ Similarly, the *Miami Towers* Plaintiffs fail to state a mail fraud claim. In order to plead mail fraud, a plaintiff must allege: (1) a scheme to defraud; (2) the use of the mails in furtherance of the scheme; and (3) culpable participation by the defendant. *Browning Ave. Realty Corp. v. Rosenshein*, 774 F.Supp. 129 (S.D.N.Y.1991). Accordingly, the "Plaintiffs must allege some fact or facts from which the court could infer the defendants 'willfully, knowingly or intentionally devised, joined, participated in or executed a scheme that at least contemplated or had as its objective some harm or injury.'" *Mills v. Polar Molecular Corp.*, No. 91 Civ. 0249, 1992 WL 309592, *5 (S.D.N.Y. Oct. 14, 1992) (quoting *Soper v. Simmons Int'l Ltd.*, 632 F.Supp. 244, 250 (S.D.N.Y.1986)).

Furthermore, mail fraud claims premised on inadequately pleaded securities fraud violations must be dismissed. *See Bresson v. Thomson McKinnon Sec. Inc.*, 641 F.Supp. 338, 348 (S.D.N.Y.1986); *Morin v. Trupin*, 778 F.Supp. 711 (S.D.N.Y.1991).

The mail fraud allegations set forth in the Complaint consist of: (1) "the general distribution of offering materials by Integrated to investors and the return of these materials by investors," 1991 Compl. ¶ 94; and (2) their periodic mailing of allegedly false progress reports to investors by the Integrated Defendants, 1991 Compl. ¶¶ 97–99. These periodic reports, eight letters sent to investors over a three year period, are alleged to have perpetuated Defendants' purported securities fraud by including: positive forecasts, dropping information about occupancy rates when they fell below 80%, and not correcting previously transmitted misleading information. 1991 Compl. ¶ 97. The net result of this alleged mail fraud was that it "lulled the plaintiffs into sleeping on their rights." 1991 Compl. ¶ 99; *see also id.* ¶ 117.

However, the *Miami Towers* Plaintiffs neither detail what negative information was omitted, how the information they did receive was instrumental in the alleged fraud, nor do they indicate what about the disseminated information was misleading.

For example, the *Miami Towers* Plaintiffs allege that they were not told when occupancy rates dropped below 80% or that there was a rental decrease. However, an examination of the letters alleged to be acts of mail fraud, reveals that the alleged misstatements were actually stated in plain terms. On four separate occasions, the *Miami Towers* Defendants notified Plaintiffs of the occupancy levels.[57] The letters also state that the Partnership's then-current rental rates per square foot were $12.00 to $13.00 on December 7, 1987, $9.00 to $14.00 on March 31, 1988

56. Under § 1961(1) of RICO, racketeering activity is defined to mean various *criminal* acts, requiring *mens rea*. In other words a finding of "racketeering activity" requires *indictable criminal* conduct, as defined in the federal statutes. 18 U.S.C. § 1961(1); *see also Holmes v. Securities Investor Protection Corp.*, —— U.S. ——, ——, 112 S.Ct. 1311, 1325, 117 L.Ed.2d 532 (1992) (O'Connor, J., concurring in part and concurring in the judgment) ("[t]he [RICO] statute unmistakably requires that there be fraud, sufficiently willful to constitute a criminal violation, and that there be a sale of securities."); *Solano v. Delmed, Inc.*, 759 F.Supp. 847, 852 (D.D.C.1991) (holding RICO liability attaches where "indictable criminal conduct as defined in the federal and state statutes."). Thus, liability can arise under RICO only where the alleged predicate acts of racketeering activity were knowingly and willfully committed by the defendant. Because only criminal violations suffice as predicate acts under RICO, the alleged predicate act must be committed by the defendant with actual knowledge of the illegal activities. *Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg*, 660 F.Supp. 1362, 1370 (D.Conn.1987); *see Metro Furniture Rental, Inc. v. Alessi*, 770 F.Supp. 198, 201 (S.D.N.Y.1991). As the Plaintiffs' Complaint fails to allege either the requisite degree of RICO scienter, or facts strongly supporting an inference of such scienter, Plaintiffs' RICO claims must be dismissed.

57. The letter of July 9, 1987 stated that "occupancy has dipped to 76%." The letter of March 31, 1988 stated that the occupancy increased "nearly 8.5%, to approximately 83.5%." The letter of December 14, 1988 stated that "occupancy currently stands at 81% economic and 76% physical." The letter of April 26, 1989 stated "occupancy stands at approximately 79%." *See* Herman Aff., Ex. B.

and $10.00 on April 26 and June 15, 1989. Far from lulling the Plaintiffs to snooze on their rights, the letters warned of economic difficulties while expressing optimistic, but cautious, efforts on their behalf.[58]

█ In the event, as here, in which Plaintiffs' own exhibits referred to in the Complaint negate the allegations of their pleadings, a court is not required to consider unsupported allegations. *See, e.g., Crystal v. Foy,* 562 F.Supp. 422, 427 (S.D.N.Y.1983) (plaintiffs' complaint dismissed where "the very document she relie[d] upon negates the charge of fraudulent concealment"). Further, a letter will not be considered mail fraud unless it is sent "for the purpose of executing the scheme." *United States v. Bortnovsky,* 879 F.2d 30, 36 (2d Cir.1989); *Morrow v. Black,* 742 F.Supp. 1199 (E.D.N.Y.1990). Thus, mailings that "serve to put the defrauded party on notice regarding the fraud" cannot constitute mail fraud. *United States v. Pacheco–Ortiz,* 889 F.2d 301, 305 (1st Cir.1989). By conceding that the September 8, 1989 letter raised "a reasonable suspicion that fraud was involved," thereby putting Plaintiffs "on notice that they were defrauded," 1991 Compl. ¶¶ 97, 99, Plaintiffs have placed that letter outside of the alleged mail fraud scheme.

Even if the statements in the letters could somehow be interpreted to be "lulling," allegations of mail fraud must posit knowing and willful criminal conduct. In the 1991 Complaint, the Miami Plaintiffs have merely parroted the language of the mail and wire fraud statutes. This pleading in no way suffices to create an inference that Defendants acted with the requisite scienter to be held liable under RICO.

In the 1991 Complaint, the *Miami Towers* Plaintiffs essentially allege that Defendants, in violating the federal mail fraud statutes:

> undertook a fraudulent plan, scheme or artifice or attempted to do so, using false and misleading statements, letters which lulled plaintiffs into inaction and perpetrated the fraud, nondisclosure and omissions which was concealed and continued by statements sent by United States mail to communicate with plaintiff and cause the plaintiffs to continue to pay their promissory notes, in violation of 18 U.S.C. § 1341. 1991 Compl. ¶ 117.

> Anchor, acting through its agent, Millennium Financial Services Inc., has joined in and continues the fraudulent scheme or artifice, by attempting to collect upon the promissory notes, hence attempting to cause defendants damage or injury in the form of deprivation for property. 1991 Compl. ¶ 118.

█ However, it is well established in this Circuit that to assert mail or wire fraud, a plaintiff must allege that a defendant (1) knowingly participated in a scheme to defraud and (2) knowingly used the mails or the wires to further the scheme. *See, e.g., United States v. Rodolitz,* 786 F.2d 77, 80 (2d Cir.), *cert. denied,* 479 U.S. 826, 107 S.Ct. 102, 93 L.Ed.2d 52 (1986); *Mills v. Polar Molecular Corp.,* No. 91 Civ. 0249, 1992 WL 309592, at *5 (S.D.N.Y. Oct. 14, 1992) ("If anything, the intentional "scheme" requirement of wire and mail fraud is a more difficult standard to meet than the "scienter" requirement under 10(b)."); *see also Browning Ave. Realty Corp. v. Rosenshein,* 774 F.Supp. 129 (S.D.N.Y.1991).[59] In *Browning,*

---

58. *See, e.g.,* Limited Partner letter of Sept. 26, 1986 ("Currently, Miami's Airport West district is experiencing an extremely soft market due to a recent decline in the city's economy coupled with overdevelopment in the area, as evidenced by an average vacancy rate of 25%. However, leasing activity has been successful in light of the fact that nearly 79% of the leases were due to expire in 1985 and 1986 ... Over the first eight months of 1986, 76,000 square feet were leased or renewed and occupancy at the property presently stands at approximately 85%."); Limited Partner letter of February 27, 1987 ("Since our last communication to you, the property has experienced a decline in its occupancy rate due to,

among other factors, a highly competitive leasing market resulting from overbuilding and generally high vacancy rates. The average vacancy in Miami's Airport West District is approximately 22%. Vacancy at the property is somewhat better than the market norm and stands at 20%."); Limited Partner letter of July 9, 1987 ("Since our last communication, occupancy at the property has dipped to 76%.").

59. In addition, allegations of mail fraud must specify the use of the mails particularity. *Frota v. Prudential–Bache Sec., Inc.,* 639 F.Supp. 1186, 1192 (S.D.N.Y.1986). Plaintiffs have totally

this Court dismissed plaintiffs' RICO claim and found that plaintiffs' burden of specifically pleading and proving defendants' fraudulent intent had not been met. *See id.* at 137; *see also Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 49 (2d Cir.1987), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988) ("In general, the mail and wire fraud statutes require, *inter alia*, a showing of intentional fraud.").

Plaintiffs have not adequately alleged that Defendants knowingly participated in a scheme to defraud. In fact, the written communications, if anything, acted to warn Plaintiffs of their risky investments' financial difficulties. Further, Plaintiffs have failed to allege how the use of the interstate mails furthered a fraudulent scheme.

**B.** *The Miami Plaintiffs Fail to Allege the Requisite Continuity Necessary to Establish a Pattern of Racketeering Activity*

The Supreme Court has held that to establish a RICO pattern, a plaintiff must show that the "racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989); *see also Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.*, 879 F.2d 10, 17 (2d Cir.1989), *cert. denied,* 493 U.S. 1022, 110 S.Ct. 723, 107 L.Ed.2d 743 (1990) (pattern requirement ensures that RICO-related activity is neither "sporadic nor isolated").

In *H.J. Inc.*, the Supreme Court held that "'[c]ontinuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241, 109 S.Ct. at 2901. Accordingly, the Court held that in order to sufficiently allege RICO violations, plaintiffs must demonstrate:

> continuity over a closed period by proving a series of related predicates extending over a *substantial period* of time. Predicate acts extending over a few weeks or months and threatening no future criminal

conduct do not satisfy this requirement: Congress was concerned in RICO with *long-term* criminal conduct.

*Id.* (emphasis added).

In this Circuit, the *Kaplan* Court, held that continuity or threat of continuity can be shown by either related predicate acts extending over a long time period or by reference to external facts that indicate that the defendant's activities are not "isolated" or "sporadic." *United States v. Kaplan*, 886 F.2d 536, 542–43 (2d Cir.1989), *cert. denied,* 493 U.S. 1076, 110 S.Ct. 1127, 107 L.Ed.2d 1033 (1990). Those external facts can be the nature of the RICO enterprise, such as an entity whose business is racketeering, or other facts that indicate that the racketeering acts will continue. *Id.; see also Continental Realty Corp. v. J.C. Penney Co.*, 729 F.Supp. 1452 (S.D.N.Y.1990) (period of more than one year insufficient to constitute continuity); *Airlines Reporting Corp. v. Aero Voyagers, Inc.*, 721 F.Supp. 579, 584 (S.D.N.Y.1989) (RICO claim dismissed in that the "closed-ended, single scheme" extended over only thirteen months insufficient "threat of continuity" for pattern requirement); *USA Network v. Jones Intercable, Inc.*, 729 F.Supp. 304, 318 (S.D.N.Y.1990) (racketeering activity spanning three and a half month period in an uncomplicated scheme with a single victim insufficient to form a pattern); *Azurite Corp. v. Amster & Co.*, 730 F.Supp. 571, 581 (S.D.N.Y.1990) (scheme spanning "at most, seven months" insufficient); *Aaronson v. Bushell*, No. 88 Civ. 8611, 1991 WL 152608, *4, 1991 U.S.Dist. LEXIS 10527, at *10 (S.D.N.Y. Aug. 1, 1991) (dismissing RICO claims because "[i]n connection with all three partnerships, the PPMs were issued and the offering of the units terminated within a matter of several months"); *Antonoff v. Bushell*, [Current Binder] Fed.Sec.L.Rep. (CCH) ¶ 90,240, ¶¶ 90,246–247, 1991 WL 95433 (S.D.N.Y. May 28, 1991) (dismissing RICO claims where "the fraudulent acts allegedly committed by defendants occurred over a period of a few months during the offering and sale of the limited partnership units ...").

failed to comply with such pleading requirements.

■ Thus, as the Supreme Court emphasized in *H.J.*, and many cases in the Circuit have held, that short-term conduct does not satisfy the continuity requirement of RICO. In the case at bar, the Miami offering period was of finite duration, spanning merely two months. It would appear that the Miami Plaintiffs are seeking to evade the ramifications of *H.J.* and *Kaplan* and their respective progeny by alleging acts of mail fraud in the years following the offering. However, such tactics, especially given the fact that the facts are inconsistent with the fraud allegedly being perpetrated, cannot satisfy the continuity requirement necessary to establish a RICO pattern.

In a similar case, *Orrison v. Balcor Co.*, No. 90 C 752, 1991 WL 556996, 1991 U.S.Dist. LEXIS 17930 (N.D.Ill. Dec. 5, 1991), involving a real estate limited partnership with over 200 plaintiff-investors, the court dismissed plaintiffs' RICO claim, finding that mailings subsequent to the offer and sale of partnership units did not constitute the requisite continuity in order to show a pattern of racketeering activity. "The securities sold to plaintiffs comprised a single offering accomplished within several months." *Id.* 1991 WL 556996 at 7, 1991 U.S.Dist. LEXIS 17930 at *23; *cf. also Morin v. Trupin*, 778 F.Supp. 711, 719 (S.D.N.Y. 1991) ("Any damage leading to these alleged injuries was done as of the date ... plaintiffs were induced to purchase limited partnership interests. The letters ... all post-date this event."); *Beck v. Cantor, Fitzgerald & Co.*, 621 F.Supp. 1547, 1555 (N.D.Ill.1985) (alleged "wrong" fully consummated at time of investment; conduct occurring thereafter "is not in furtherance" of the alleged fraudulent scheme).

Similarly, in *Marshall–Silver Constr. Co. v. Mendel*, 894 F.2d 593, 597 (3d Cir.1990), the Third Circuit noted that "[v]irtually every garden-variety fraud is accomplished through a series of wire or mail fraud acts that are 'related' by purpose and spread over a period of at least several months." So too, the Miami Plaintiffs' RICO action is nothing more than an ordinary fraud case clothed in the Emperor's trendy garb.

As Congress intended a "more natural and common-sense approach to RICO's pattern element," *H.J., Inc.*, 492 U.S. at 237, 109 S.Ct. at 2899, it seems particularly inappropriate to invoke the RICO mantra in the context *Miami Tower's* single limited partnership which was issued in a single month. In any event, the *Miami Towers* Complaint fails to adequately allege either predicate acts, or continuity in such a way to satisfy Fed.R.Civ.Pro. 9(b) requirements under RICO. Accordingly, the *Miami Towers* Defendants' Global Motion III, dismissing the *Miami Towers* Plaintiffs' RICO claims is granted.

### C. The Miami Plaintiffs' RICO Claims Against Anchor, Dreyer & Traub, and Appraisal Group International are Insufficient

#### 1. Plaintiffs' RICO Allegations Against Anchor are Dismissed

The entirety of the *Miami Towers* Plaintiffs' allegations against the Anchor Defendants is stated in the 1991 Complaint as follows:

TENTH CLAIM: Racketeer Influenced Corrupt Organizations Act § 1962(d)

145. Plaintiffs reallege paragraphs 1 through 144, as if fully set forth herein. This claim is brought against all of the Defendants.

146. Anchor purchased the notes after due diligence and voluntarily chose to become part of the continuing conspiracy to fraudulently deprive plaintiffs of their property.

147. The Defendants associated with, and conspired with, one another to accomplish the goals and purposes of violation (sic) of the Racketeer Influenced Corrupt Organizations Act § 1962(a), (b), and (c).

148. Plaintiffs were injured by reason of the violation of 18 U.S.C. § 1962(d).

1991 Complaint, ¶¶ 145–48.

The *Miami Towers* Plaintiffs' RICO claims, as alleged in the 1991 Complaint, against the Anchor Defendants fail.[60] The

---

60. In Plaintiffs' Global III brief, they allege, for the first time, that Anchor additionally violated

*Miami Towers* Plaintiffs have not alleged that Anchor agreed to the commission of two predicate acts or that the *Miami Towers* Plaintiffs suffered any specific damage as a result of RICO violation by Anchor. Any participation by the Anchor defendants only occurred after the alleged securities fraud and mail fraud predicate acts were allegedly committed by the other Defendants in the action.

■ As allegations that do not include an agreement by a conspirator to commit two or more predicate acts cannot form the basis of a claim for RICO conspiracy in this Circuit, the § 1962(d) claim against Anchor cannot survive a motion to dismiss. *See United States v. Barton,* 647 F.2d 224, 237 (2d Cir.), *cert. denied,* 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981) (holding RICO requires proof of an "agreement" to perform at least two predicate acts.); *Hecht v. Commerce Clearing House, Inc.,* 897 F.2d 21, 25 (2d Cir.1990) (holding "[b]ecause the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement.").[61]

Therefore, the Anchor Defendants Global Motion III, dismissing RICO claims as alleged against them, is granted.

### 2. *Plaintiffs' RICO Allegations Against Dreyer & Traub's Motion Are Dismissed*

Plaintiffs allege that Dreyer & Traub was retained by the *Miami Towers* Defendants to "draft the Memorandum" and to advise them

on "compliance with the securities laws." 1991 Compl. ¶ 20. The *Miami Towers* Plaintiffs allege that Dreyer & Traub violated §§ 1962(a)–(d). According to the 1991 Complaint, Dreyer & Traub's role in drafting of the PPM constitutes their alleged first predicate act of securities fraud. *Id.* ¶ 59. Their second predicate act is alleged to be mail fraud:

> Upon information and belief ... Dreyer & Traub was retained as counsel to many of 500–600 limited partnership offerings sponsored by Integrated. In [this] capacity they must have known that the Integrated defendants in the normal course of business ... would send out reports to the investors and that these reports would not disclose the fraud and would thus perpetuate it.

1991 Compl. ¶ 100.

Plaintiffs' security and mail fraud claims fail for the reasons stated above. *See supra,* III.A. Further, as described above, the *Miami Towers* Plaintiffs' RICO claims cannot survive as alleged against Dreyer & Traub because they have not adequately alleged the continuity requirement. *See* III.B. *supra; Landy v. Mitchell Petroleum Technology Corp.,* 734 F.Supp. 608, 624 (S.D.N.Y. 1990) (dismissing RICO claims for lack of continuity; "it is impossible to determine from the face of the complaint what, if any role, the remaining defendants had ... beyond the creation and distribution of the offering materials, an event that occurred at

18 U.S.C. § 1962(c) and in doing so, Anchor committed two or more predicate violations of 18 U.S.C. § 1957 (engaging in transactions in criminally derived property) and "possibly ... [18 U.S.C.] § 1956 as well" (money laundering). Pl. Global Mot. III Br. at 31. As Plaintiffs' 1991 Complaint explicitly omits Anchor from its § 1962(c) violations, and as no facts have been alleged to sustain their additional pleadings, the § 1962(c) allegations against Anchor are dismissed. *See Beck v. Manufacturers Hanover Trust Co.,* 820 F.2d 46, 49–51 (2d Cir.1987), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988).

**61.** Numerous district court decisions have likewise dismissed RICO complaints that do not allege agreement by an accused conspirator. *See, e.g., Connolly v. Havens,* 763 F.Supp. 6, 14 (S.D.N.Y.1991); *Morin v. Trupin,* 711 F.Supp.

97, 111 (S.D.N.Y.1989); *Morin v. Trupin,* 747 F.Supp. 1051, 1067 (S.D.N.Y.1990); *Com–Tech Assocs. v. Computer Assocs. Int'l, Inc.,* 753 F.Supp. 1078, 1092 (E.D.N.Y.1990), *aff'd,* 938 F.2d 1574 (2d Cir.1991); *Iacobucci v. Universal Bank of Maryland,* No. 90 Civ. 2719, 1990 WL 180139, 1990 U.S. Dist. LEXIS 15179 (S.D.N.Y. Nov. 13, 1990); *Enzo Biochem, Inc. v. Johnson & Johnson,* No. 87 Civ. 6125, 1990 WL 136038, 1990 U.S.Dist. LEXIS 12021 (S.D.N.Y. Nov. 13, 1990); *First City Nat'l Bank & Trust Co. v. Federal Deposit Ins. Co.,* 730 F.Supp. 501, 509–10 (E.D.N.Y.1990); *Reinfeld v. Riklis,* 722 F.Supp. 1077, 1083 (S.D.N.Y.1989); *Friedman v. Arizona World Nurseries Ltd. Partnership,* 730 F.Supp. 521, 549 (S.D.N.Y.1990), *aff'd,* 927 F.2d 594 (2d Cir.1991); *Grunwald v. Bornfreund,* 668 F.Supp. 128, 133 (E.D.N.Y.1987).

best over a few months and which has long since ceased.").

Ultimately, the Dreyer & Traub Defendants' fraudulent acts occurred over too short a time period to constitute "long-term criminal conduct" required by *H.J. See H.J.*, 492 U.S. at 242, 109 S.Ct. at 2902 ("Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement."). Therefore, Dreyer & Traub's Global Motion III dismissing the *Miami Towers* Plaintiffs' RICO claims is granted.

### 3. *Plaintiffs' RICO Allegations Against Appraisal Group International's Are Dismissed*

For much of the same reasons outlined above, the Miami Plaintiffs §§ 1962(a)–(d) RICO claims against the Appraisal Defendants must fail. The allegations against the Appraisal Defendants concern the performance of one appraisal with respect to one property at one finite and discrete point of time. 1991 Compl. ¶¶ 17, 18, 29, 30 and 59. Therefore the *Miami Towers* Plaintiffs cannot meet RICO's continuity requirement. *See supra*, III.B; *see also H.J.* at 492 U.S. 229, 109 S.Ct. 2893 (1989). Additionally, the *Miami Towers* Plaintiffs have not alleged sufficient facts to indicate that the Appraisal Defendants "agreed" to the alleged RICO conspiracy in a such a way that their § 1962(d) claim may survive. *See supra*, III. C.1.

Accordingly, the Appraisal Defendants Global Motion III to dismiss the *Miami Towers* Plaintiffs RICO claims is granted.

### Conclusion

For the foregoing reasons, Global Motion III is granted in part and denied in part, and Global Motion IV is granted. Therefore, the causes of action are dismissed as set forth above. Settle order on notice.

The parties to the remaining actions in this MDL are hereby directed to attend a pre-trial conference on January 5, 1984 at 4:00 PM, subject to the convenience of the parties.

It is so ordered.

## OPINION ON REARGUMENT

On October 10, 1991 the Judicial Panel on Multidistrict Litigation ("MDL") consolidated and transferred to this Court a number of actions arising out of the demise of partnerships affiliated with Integrated Resources, Inc. ("Integrated"), which has filed for relief under Chapter 11 of the bankruptcy code, 11 U.S.C. §§ 101, *et seq.* in 1990. *See In re Integrated Resources*, 135 B.R. 746, 748 (Bankr.S.D.N.Y.1992), *aff'd, In re Integrated Resources, Inc.*, 147 B.R. 650 (S.D.N.Y.1992).

On December 22, 1993 this Court issued its second Opinion concerning the legal sufficiency of the federal RICO claims ("Global III") and the application of such RICO and federal securities law claims to certain later filed actions ("Global IV"). *See In re Integrated Resources Real Estate Ltd. Partnerships Sec. Litig.*, 850 F.Supp. 1105 (S.D.N.Y. 1993) ("*Global III and IV*" or the "Opinion"). Plaintiffs in three of the consolidated actions, *RAM/Pate, Clovine/Ellingson*, and *Barron/Miami Towers*, now seek reargument of that Opinion, pursuant to Local Rule 3(j).

For the reasons set forth below, the motions to reargue the Opinion are denied.

### *The Parties*

The *RAM/Pate* Plaintiffs are investors in Resources Accrued Mortgage Investors L.P. Series 86 ("RAM 86") which invested mortgage loans in 16 of Integrated's affiliates. Plaintiffs invested in RAM 86 between January 1986 and May 1, 1987.

The *Clovine/Ellingson* Plaintiffs invested in a Connecticut limited partnership organized to acquire two parcels of land, several office buildings, and to conduct various site improvements thereupon in Cincinnati, Ohio.

The *Miami Towers* Plaintiffs invested in the Miami Executive Towers Associates Limited Partnerships which owned two neighboring office buildings, and leased the underlying ground, in Miami, Florida known as Airport Executive Towers I and II. The Bleistine Plaintiffs purchased their securities between May and June, 1985, but were not added to the action until January 30, 1990.

*Prior Proceedings and Facts*

The parties, prior proceedings and facts have been thoroughly set forth in the previous opinions of this Court, familiarity with which are presumed. *See In re Integrated Resources Sec. Litig.*, 815 F.Supp. 620 (S.D.N.Y.1993) (*"Global I"* and/or *"Global II"*); *In re Integrated Resources Sec. Litig.*, 850 F.Supp. 1105 (S.D.N.Y.1993) (*"Global III'* and/or *"Global IV"*).

Briefly, *Global I* addressed the statutes of limitations governing the Plaintiffs' federal securities claims; *Global II* addressed the legal sufficiency of the Plaintiffs' federal securities claims; *Global III* addressed the legal sufficiency of the Plaintiffs' federal RICO claims; and *Global IV* applied the prior three global Opinions to one of the surviving Later Filed Actions.

The motions to reargue were considered fully submitted as of January 24, 1994.

*Discussion*

### I. The Legal Standards of Local Rule 3(j)

The standards controlling a motion for reargument pursuant to Local Rule 3(j) and a motion to amend the judgment pursuant to Rule 59(e), Fed.R.Civ.P., are the same. *See Morser v. AT & T Info. Sys.*, 715 F.Supp. 516, 517 (S.D.N.Y.1989); *Lotze v. Hoke*, 654 F.Supp. 605, 607 (E.D.N.Y.1987).

█ Local Rule 3(j) provides in pertinent part:

There shall be served with the notice of motion a memorandum setting forth concisely the matters or controlling decisions which counsel believes the court has overlooked. No oral argument shall be heard unless the court grants the motion and specially directs that the matter shall be reargued orally. No affidavits shall be filed by any party unless directed by the court.

Thus, to be entitled to reargument under Local Rule 3(j), the Plaintiffs must demonstrate that the Court overlooked controlling decisions or factual matters that were put before the Court on the underlying motion. *See Ameritrust Co. Nat'l Ass'n v. Dew*, 151 F.R.D. 237 (S.D.N.Y.1993); *Fulani v. Brady*, 149 F.R.D. 501, 503 (S.D.N.Y.1993); *East Coast Novelty Co. v. City of New York*, 141 F.R.D. 245, 245 (S.D.N.Y.1992); *B.N.E. Swedbank, S.A. v. Banker*, 791 F.Supp. 1002, 1008 (S.D.N.Y.1992); *Novak v. National Broadcasting Co.*, 760 F.Supp. 47, 48 (S.D.N.Y.1991); *Ashley Meadows Farm Inc. v. American Horse Shows Ass'n*, 624 F.Supp. 856, 857 (S.D.N.Y.1985).

█ Local Rule 3(j) is to be narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been considered fully by the court. *See Caleb & Co. v. E.I. Du Pont De Nemours & Co.*, 624 F.Supp. 747, 748 (S.D.N.Y.1985). In deciding a Local Rule 3(j) motion, the court must not allow a party to use the motion to reargue as a substitute for appealing from a final judgment. *See Morser*, 715 F.Supp. at 517; *Korwek v. Hunt*, 649 F.Supp. 1547, 1548 (S.D.N.Y.1986). As such, a party in its motion for reargument "may not advance new facts, issues or arguments not previously presented to the court." *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb, Inc.*, No. 86 Civ. 6447, 1989 WL 162315, at *4, 1989 LEXIS 9145, at *10 (S.D.N.Y. Aug. 4, 1989).

### II. The RAM/Pate Plaintiffs' Motion to Reargue is Denied

The RAM/Pate Plaintiffs allege three purported matters of fact or law overlooked by the Court in the Opinion which justify reargument: (1) the Court overlooked the Plaintiffs' claim that the Defendants failed to disclose to investors that the RAM 86 investment was allegedly known to be worthless from the outset and was therefore fraudulent; (2) the Court overlooked the Second Circuit's ruling in *Cruden v. Bank of New York*, 957 F.2d 961 (2d Cir.1992) (*"Cruden"*); and (3) the Court overlooked the fact that RAM 86 was a public offering, not governed under Regulation D, Rules 501–08, 17 C.F.R. 230.501–.508, of the Securities Act of 1933 (the "1933 Act").

### A. The Opinion Did Not Overlook the "Gravamen" of the Proposed Amended Complaint

The RAM Plaintiffs contend that this Court overlooked the "gravamen" of their

Proposed Amended Complaint in that the Defendants allegedly used the RAM partnerships to "cash out" uneconomical mortgages and that Defendants knew that the mortgages to be acquired by the RAM partnerships were worthless. Pls.' Mem. of Law at 4–5.

In the Opinion, the Court considered the Plaintiffs' claims about the nature of the asserted fraud,[1] but simply did not agree with their characterization of the events surrounding the investment in RAM 86. The Opinion, on no less than four separate occasions, explicitly refers to the Plaintiffs' allegations that the Defendants had failed to disclose that RAM 86 was purportedly designed for the purpose of "cashing out" certain "uneconomical mortgages." *See Global III*, at 1129 n. 39, 1131 (holding purported design to "cash out" the alleged "uneconomic mortgages" was disclosed at time of investment or soon thereafter).

Plaintiffs further contend that the Opinion overlooked the alleged fraudulent nature of the Supplements which allegedly failed to disclose the valueless nature of the mortgages discussed therein. In the Opinion, the Court noted that the Plaintiffs invested in RAM 86 between January 1986 and May 1, 1987. *Global III* at 1129. The fact that a plaintiff may have invested solely in reliance on the Prospectus, or after one of the Supplements had been released, does not alter the Court's determination that the statute of limitations had started to toll, since these allegations of the purported fraud should have been triggered by the disclosures in the Prospectuses and Supplements received by the investors. This claim is adequately addressed by the Opinion. *See Global III* at 1129–1132.

## B. *The Opinion Did Not Overlook the Second Circuit's Opinion in Cruden*

Plaintiffs contend that the Opinion overlooked the Second Circuit's decision in *Cruden v. Bank of New York*, 957 F.2d 961 (2d Cir.1992), and, as a result, erroneously tolled the statute of limitations period from the

time a reasonable investor would have been aware of their claims instead of the time they alleged that their actual injury occurred in March 1991, that is, when their account statements revealed the value of their investments had dropped.

The Court considered the *Cruden* decision in reviewing the Second Circuit's law concerning the accrual date of RICO claims, *see Global III* at 1118, but disagreed with the Plaintiffs' reading of that decision. The Second Circuit continues to differentiate cases in which plaintiffs have knowledge, or reasonably should have knowledge, of their alleged injuries from those cases in which an injury is disguised until some later triggering event. *Compare Long Island Lighting Co. v. Imo Indus., Inc.*, 6 F.3d 876, 887 (2d Cir.1993) (holding Plaintiffs should have known of their injury at earlier date) *with Cruden v. Bank of New York*, 957 F.2d 961 (2d Cir.1992) (holding Plaintiffs injuries were disguised and Plaintiffs could not have known of their injury at earlier date).

In *Cruden* the later triggering event was found to be at the point when certain debentures went into default. Similarly, in another case cited by the Plaintiffs, *Rohland v. Syn-Fuel Assocs.*, 89 Civ. 3325, 1994 WL 242145 (S.D.N.Y. Jan. 18, 1994), a subsequent tax court decision which deprived the plaintiffs of their expected tax benefits was found to constitute a triggering event.

Such is not the case here. The RAM/Pate Plaintiffs claim that they were fraudulently induced into investing in RAM 86. However, as discussed in the opinion, all the alleged fraudulent statements were adequately disclosed at the time of the investment itself: in essence, the Plaintiffs' alleged injuries occurred at the time of the investment itself—not at some later point of time. In other words, a Plaintiff's "claim accrues when the plaintiff 'knows or has reason to know' of the injury that is the basis of the action.'" *Long Island Lighting Co. v. Imo Indus., Inc.*, 6 F.3d 876, 887 (2d Cir.1993) (citations omitted) (reviewing Second Circuit law including the

---

**1.** In fact, the Opinion cites many of the very paragraphs of the Complaints that the Plaintiffs cite in their Memorandum in Support of Motion to Reargue. *Compare Global III* at 1129–1130

(citing Compl. ¶¶ 4, 10, 12, 11, 16, 19, 23, 17, 19, 22, 29 and Am. Compl. ¶¶ 27, 34, 43, 45, 50, 51, 53) *with* Pls.' Mem. of Law at 4–8 (citing Am. Compl. ¶¶ 14, 20, 29, 43, 45, 46, 50).

holdings in *Cruden* and *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096 (2d Cir.1988)). On the basis of these claims the Opinion correctly determined that the Plaintiffs should have been placed on notice of their RICO claims at the time of their investments or shortly thereafter.

### C. The Court Did Not Overlook the Fact That RAM 86 Was a Public Offering

Plaintiffs' final contention is that the Court somehow overlooked the fact that RAM 86 was not offered under Regulation D of the 1933 Act, and that the Plaintiffs were not "accredited investors." It is true that, as a preliminary matter, the Court noted that "[i]n general" much of this litigation was a result of investments associated with Integrated Resources or entities associated with Integrated. *Global III* at 1111. The purpose of that preamble was to paint a picture, in general terms, of the nature of the parties, the offerings, and the relative sophistication of the investments which are at issue throughout these actions. *See Id.* at 1111–1113. It appears that the confusion, cited by the Plaintiffs, was generated by this background preamble.

However, the Court did not apply these general background comments to the specific case of the RAM 86 Plaintiffs. Plaintiffs fail to cite any section of the Opinion discussing the RAM 86 investments in their memorandum of law which would buttress their contention that the Court erroneously believed them to be Regulation D investors. In fact, the Court quotes from a section of the RAM 86 Prospectus which informed potential investors that Integrated was a "publicly-held corporation whose common stock is traded on the New York Stock Exchange." *Global III* at 1129 (quoting RAM 86 Prospectus at 35).

Accordingly, for the reasons set forth above, the RAM 86 Plaintiffs motion to reargue, pursuant to Local Rule 3(j), is denied.

### III. The Miami Towers Plaintiffs' Motion to Reargue Is Denied

### A. The Affidavit of Martin Mushkin Fails to State a Basis For Reargument

The affidavit of Martin Mushkin, counsel to the *Miami Towers* and *Clovine/Ellingson* Plaintiffs, has been proffered to "merely set[ ] out factual material that appeared in our Global I and II Memorandum of Law and in our April 15 Submission ... No new material has been added...." Mushkin Aff. at 2.[2] Accordingly, as counsel apparently concedes, the Court has considered and reviewed these materials in *Global III and IV.* Nowhere in this affidavit, nor in the attached letter of August 2, 1993,[3] does counsel identify material that the Court overlooked and accordingly, the Mushkin affidavit has failed to present a ground for reargument. *See Violette v. Armonk Assocs., L.P.,* 823 F.Supp. 224, 225 (S.D.N.Y.1993); *Weissman v. Fruchtman,* 124 F.R.D. 559, 560 (S.D.N.Y. 1989) (denying reargument when it is merely a "wasteful repetition of arguments already briefed, considered and decided.").

### B. The Bleistines May Not Reargue the Decision Dismissing Their Securities Fraud Claim

In *Global IV,* the Court erroneously stated that Philip and Patricia Bleistine were not added to the Complaint until November 20, 1990. *Global IV* at 1134. In reality, it appears that these Plaintiffs were added to the Complaint in a "So Ordered" stipulation by the Honorable John E. Sprizzo on January 30, 1990. Nevertheless, as the Bleistines are residents of Georgia, their Section 10(b) claim remains time-barred under the Georgian statute of limitations. *See Global IV* at 1139.

Accordingly, the motion to reargue the decision dismissing the Bleistines' § 10(b) claims is denied.

---

**2.** Although Local Rule 3(j) specifically states that "[n]o affidavits shall be filed by any party unless directed by the court[,]" the Court will allow the Mushkin Affidavit to be submitted for the purposes of this motion.

**3.** All correspondence in these actions has been reviewed and duly considered by the Court in writing the Global Opinions, whether submitted before, during, or after the official briefing schedule.

### C. The Miami Towers Plaintiffs Fail to Cite Any Overlooked Aspect of Securities Law Warranting Reargument

The *Miami Towers* Plaintiffs contend that the Court failed to take into account the "Better Case Law" which reflects the "Realities of the Marketplace." Pls.' Mem. of Law at 10. The Plaintiffs point to *Virginia Bankshares Inc. v. Sandberg,* 501 U.S. 1083, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991) (*"Virginia Bankshares"*) and the cases cited therein to support their argument that the Opinion places too high of a burden upon the Plaintiffs to inquire about the nature of their investments.[4]

▪ *Virginia Bankshares,* a proxy case, found it to be fraudulent for directors of a company to express an opinion to the effect that a proposed freeze-out merger price was fair to the shareholders, when in fact the price was unfair and the directors knew so at the time. *Id.* at ——, 111 S.Ct. at 2761. The Court continued to note that while publishing sufficient cautionary facts can render a misleading expression of opinion "too unimportant to ground liability," it is also evident that "not every mixture [of such misleading statements] with the true [statements] will neutralize the deceptive." *Id.* at ——, 111 S.Ct. at 2760. "If it would take a financial analyst to spot the tension between the [true] and the [untrue], whatever is misleading will remain materially so, and liability should follow." *Id.* (citing *Gerstle v. Gamble–Skogmo, Inc.,* 478 F.2d 1281, 1297 (2d Cir.1973)).

However, Plaintiffs misrepresent the breadth of the *Virginia Bankshares* ruling, especially when considered in the context, or "reality," if they will, of this case. As a recent law review article has noted: ·

> *Virginia Bankshares* dealt with a fairness opinion ostensibly based on existing value-related factors, not simply a projection or estimate, and the fairness opinion was not qualified by any direct cautionary language at all.... [T]he bespeaks caution cases usually do not involve cautionary language of the sort that requires training in investment analysis to comprehend.

Donald C. Langevoort, *Disclosures That "Bespeak Caution",* 49 The Business Lawyer, 481, 491 (1994).

The ruling of *Virginia Bankshares* is essentially seen as a contextual one. As such it yields no great insight in contrast to the other rulings which were extensively discussed in the Opinion. *See Global IV,* at 1139–1142; *see also Global II,* 815 F.Supp. 620, 674–75 (S.D.N.Y.1993). Nevertheless, in that specific context, the First American Bank of Virginia's directors "omitted any mention of the Bank's value as a going concern at more than $60 a share, as against the merger price of $42," *Virginia Bankshares,* 501 U.S. at ——, 111 S.Ct. at 2761, and falsely claimed that the merger price was more than the book value. Here, as the Opinion notes, the *Miami Towers* Plaintiffs failed to allege any *material* misrepresentations or omissions which were not in fact adequately disclosed. *See Global IV,* at 1142–1144 (holding appraisal and Clark–Biondi report were available for inspection upon request).[5]

Accordingly, the *Virginia Bankshares* case does not constitute controlling law overlooked by the Court for Local Rule 3(j) purposes.

### D. The Miami Towers Plaintiffs May Not Reargue the Dismissal of Their RICO Claims

The *Miami Towers* Plaintiffs assert that the Court incorrectly found they failed to pled scienter necessary to sustain a claim of securities fraud as a predicate act for their RICO claim. They also assert that if allowed

---

**4.** Plaintiffs also cite what they consider to be the "Better Case Law" from seemingly every Circuit, but the Second, as well as the Northern District of Illinois, all of which are interesting, but not binding, upon this Court and therefore do not constitute overlooked controlling law under the standards of Local Rule 3(j).

**5.** Additionally, it must be noted that the Plaintiffs' § 10(b) claims were also dismissed for fail-

ing to adequately plead loss causation or transaction causation as well as for failing to plead fraud with the particularity required by Fed. R.Civ.P. 9(b). Plaintiffs have not sought reargument on either of these grounds, and accordingly, the Court presumes that they have agreed with the result of *Global IV,* if not the specific findings which they challenge.

to replead they could allege continuity by establishing a link between the Defendants' alleged acts in two different partnerships—*Miami Towers* and *Clovine/Ellingson*.

Regarding the scienter claim, the Plaintiffs allege that the willfulness standard described by the Second Circuit in *Metromedia Co. v. Fugazy,* 983 F.2d 350 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993) ("*Metromedia Co.*"), for a § 12(2) violation was not applied by the Court in the Opinion. This assertion is inconsistent with the Opinion of the Court which simply noted that the standard for the requisite degree of scienter for a predicate act of securities fraud is willfulness. *Compare Global IV,* at 1145 n. 56 (finding RICO liability attaches only when alleged predicate acts of racketeering were "knowingly and wilfully committed by defendant"), *with Metromedia Co.,* 983 F.2d at 362–64 (noting standard for a § 12(2) violation is "willful").

The Opinion states that the *Miami Tower* Plaintiffs' have failed to adequately plead willfulness. As analyzed by this Court, the Complaint, *see* Compl. ¶¶ 29–31, 42–58, does not state a set of facts from which it could be inferred that the Defendants acted with requisite scienter. *See Global IV,* at 1144–1145. Accordingly, the Plaintiffs have yet to present any controlling set of facts or law which would satisfy the standards for reargument under Local Rule 3(j) on the issue of scienter.

The *Miami Towers* Plaintiffs also seek reargument on the question of continuity under RICO. First, it must be noted that no predicate acts have been sufficiently alleged by the Plaintiffs to establish continuity necessary to sustain a RICO claim. *See Global IV* at 1147–1148; *H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989). Second, the Plaintiffs may not at this point allege a "pattern of racketeering" by the wholesale incorporation of allegations in another Integrated action—the *Clovine/Ellingson* action—without referring to that action in the Complaint. This is especially odd in light of the fact that the *Clovine/Ellingson* Plaintiffs maintain that their action is unrelated to the rest of the Multidistrict Litigation involving Inte-

grated. Even if the Court considered the notion of fusing these two actions into a continuous scheme, it would be unlikely to survive the requirements of continuity as set forth by the Supreme Court in *H.J. See Id.,* 492 U.S. at 241–42, 109 S.Ct. at 2901–02; *Antonoff v. Bushell,* 1991 WL 95433, 1991 U.S.Dist. LEXIS 7167 (S.D.N.Y. May 28, 1991); *Aaronson v. Bushell,* 1991 WL 152608, 1991 LEXIS 10527 (S.D.N.Y. Aug. 1, 1991).

Accordingly, the *Miami Towers* Plaintiffs' motion to reargue the dismissal of their RICO claims is denied.

### IV. *The Clovine/Ellingson Plaintiffs' Motion for Reargument is Denied*

It appears that much of the *Clovine/Ellingson* Plaintiffs' claims for reargument have evaporated. *See* Letter of Martin Mushkin to David Zensky of Feb. 1, 1994. To the extent the Plaintiffs adopt the contentions of the RAM/Pate Plaintiffs' argument that the Court overlooked *Cruden,* their motion is denied for the grounds set forth above in Section II.B, *supra.*

By piecing together the Plaintiffs' affidavit, Memorandum of Law and letter of February 1, 1994, the only serious claim which appears to remain alive for reargument purposes is the Plaintiffs' contention that the Court injected a "special damage" requirement for RICO liability. The Court did not and does not believe that such a requirement exists in the RICO statute. The Opinion merely notes as an aside that the failure of long term business projections to fulfill their cautionary expectations unfortunately cannot constitute a predicate act under RICO. *See Global III,* at 1121–1122. The basis for the dismissal of their RICO claims, however, was because they were time-barred. *Id.* at 1122–1123.

Accordingly, the *Clovine/Ellingson* Plaintiffs' motion for reargument, pursuant to Local Rule 3(j), is denied.

### *Conclusion*

For the reasons set forth above, the *RAM/ Pate, Miami Towers,* and *Clovine/Ellingson*

Plaintiffs' motions to reargue, pursuant to Local Rule 3(j), are denied.

It is so ordered.